UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ALLEN KUTSY

CHANA DUBAN

Docket no.: 1:14-cv-00930

                                        Plaintiffs,

                 -AGAINST-                                AMENDED VERIFIED
                                                         COMPLAINT

                                                         JURY TRIAL DEMANDED

Administration for Children Services aka NYCCS; Cecilia Sheppard;

"Jane" Samuels; Ronald E. Richter;

The City of New York; New York City Police Department;

71st Precinct NYPD; Lueitenant "John" Worobey; 79th Precinct NYPD;

Ohel Children's Home and Family Services; Kelly Sarway;

Leoni Pludwinski; Elisheva Bercowits;

Sylvia Madison; Does 1- 1XX

                                        Defendants.

-------------------------------------------------------------------X

## Preliminary Statement

1. Plaintiffs are United States citizens concerned that the climate that currently pervades America's children's welface agencies is eroding long-standing constitutional rights. Today, Plaintiffs file this lawsuit because they believe that parents have a right to parental liberties including not having to fear that their children will be snatched by government officials without proper due process.

2. It is well established that a parent's right to the care and custody of a child is a fundamental right protected by the United States Constitution. The liberty interest in the privacy of the family is reciprocal: children have the right to be raised by their parents free of governmental interference.

3. The failings of America's child welfare system can be summed up by the very rationalization often used to justify the way it works today, an approach that can be boiled down to "take the child and run."

4. When a child is needlessly thrown into foster care, he loses not only mom and dad but often

child and run."

4. When a child is needlessly thrown into foster care, he loses not only mom and dad but often brothers, sisters, aunts, uncles, grandparents, teachers, friends and classmates. For a young enough child it can be an experience akin to a kidnapping. Other children feel they must have done something terribly wrong and now they are being punished. One recent study of foster care "alumni" found they had twice the rate of post-traumatic stress disorder of Gulf War veterans and only 20 percent could be said to be normal.

5. A second study, of 15,000 cases,   found that even maltreated children left in their own homes with little or no help fared better, on average, than comparably- maltreated children placed in foster care.

6. All that harm can occur even when the foster home is a good one. The majority are. But the rate of abuse in foster care is far higher than generally realized and far higher than in the general population.

7. That same alumni study found that one-third of foster children said they'd been abused by a foster parent or another adult in a foster home.

8. Furthermore, the more a foster care system is overwhelmed with children who don't need to be there, the less safe it becomes, as agencies are tempted to overcrowd foster homes and lower standards for foster parents.The more that workers are overwhelmed with children who don't need to be in foster care, the less time they have to find children in real danger.

9. None of this means no child ever should be taken from her or his parents. Rather, it means that foster care is an extremely toxic intervention that must be used sparingly and in small doses. But for decades, America's child welfare systems have prescribed mega-doses of foster care.

10. Thanks to a class-action lawsuit, Alabama is rebuilding its entire child welfare system to emphasize keeping families together. Alabama takes away children at one of the lowest rates in the nation. But the state has cut the rate of reabuse of children left in their own homes in half, and the independent, court-appointed monitor who oversaw the lawsuit found that children are safer now than they were before the changes. ( http://nccpr.info/issue-papers/ and this New York Times story about the Alabama reforms: http://bit.ly/5ydDoW).

11. A decade ago, at any one time in Illinois, more than 50,000 children were trapped in all forms of substitute care. Today the number is under 17,000. Illinois takes away children at an even lower rate than Alabama. And in Illinois, as in Alabama, independent court appointed monitors have found that, as the number of children taken away has declined, child safety has improved.

12. There are a wide variety of proven programs that can keep these children in their own homes, and do it with a far better track record for safety than foster care. And all of the problems are compounded by pervasive racial bias.

13. University of Florida Medical Center researchers studied two groups of infants born with cocaine in their systems. One group was placed in foster care, the other with birth mothers able

to care for them. After six months, the babies were tested using all the usual measures of infant development: rolling over, sitting up, reaching out. Consistently, the children placed with their birth mothers did better. For the foster children, being taken from their mothers was more toxic than the cocaine.

14. It is extremely difficult to take a swing at "bad parents" without the blow landing on their children. If we really believe all the rhetoric about putting the needs of children first, then we need to put those needs ahead of everything – including how we may feel about their parents.

15. Services are no substitute for due process.

16. The normal protections of due process of law simply don't apply in child welfare proceedings. Children can be stripsearched – and seized – without a warrant. Children can be taken solely on the authority of a caseworker without a hearing beforehand. At the hearing afterwards, there is no guarantee of counsel for the indigent, and usually no effective counsel at all. The standard of proof is no higher than that used to determine which insurance company pays for a fender-bender. Once again, the problem with all this is not the harm to parents – rather the harm is to children needlessly trapped in foster care. For more on this see NCCPR's Due Process Agenda.

17. "There is no system ever devised by mankind that is guaranteed to rip husband and wife or father, mother and child apart so bitterly than our present Family Court System." -Judge Brian Lindsay Retired Supreme Court Judge, New York , New York"

18. From the Decision of U.S. District Judge Jack Weinstein in Nicholson v. Williams, Case #00-CV2229, U.S. District Court, Eastern District of New York

This case challenged the practice of New York City's Administration for Children's Services of removing the children of battered mothers solely because the children saw their mothers being beaten by husbands or boyfriends. Judge Weinstein ruled that the practice is unconstitutional and he ordered it stopped.

19. In general, the experts found that witnessing domestic violence is sometimes, but not always, harmful to children. And even when witnessing domestic violence does harm, removing the child from the non-offending parent is more harmful. Indeed, one expert testified that a removal under such circumstances "is tantamount to pouring salt on an open wound."

20. A battered mother also may be judged harshly if she did not pursue criminal

action against the abuser although battered mothers often have good reason to

forgo criminal remedies. The Court of Appeals, in recognized

that, "[a]lthough the abusers' guilt may be clear and provable, many victims of

domestic violence decide not to pursue charges for a host of reasons, including

fear of retaliation, financial dependence and threats of violence. . . .,"

12 and in Nicholson added that declining to prosecute may itself be an exercise of care.

21. Dr. Evan Stark cited studies which demonstrated that, among children exposed to the most severe domestic violence, well over 80 percent, and sometimes over 90 percent, tested psychologically normal, were self-confident, had positive images of themselves and were emotionally well off. Furthermore, while children exposed to the most severe forms of domestic violence are more likely to become violent adults or delinquents, 95 to 97 percent of the children in these situations do not become delinquent, do not develop alcohol or drug problems, and about 90 percent do not become violent adults.

22. In a 1999 study by Jeffrey L. Edelson he concludes "...some child protection agencies in the United States appear to be defining exposure to domestic violence as a form of child maltreatment.... Defining witnessing as maltreatment is a mistake. Doing so ignores the fact that large numbers of children in these studies showed no negative development problems and some showed evidence of strong coping abilities. Automatically defining witnessing as maltreatment may also ignore battered mothers' efforts to develop safe environments for their children and themselves.

23. Dr. Peter Wolf testified that the attachment between parent and child forms the basis of who we are as humans and the continuity of that attachment is essential to a child's natural development. Tr. 565-67. See also, Joseph Goldstein, Medical Care for the Child at Risk: On State Supervision of Parental Autonomy, 86 Yale L.J. 645, 649-50 (1977) ("No other animal is for so long after birth in so helpless a state that its survival depends on continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breach in the familial bond will be detrimental to the child's well-being.").

24. Dr. Wolf testified that disruptions in the parent-child relationship may provoke fear and anxiety in a child and diminish his or her sense of stability and self. Tr. 565-67. He described the typical response of a child separated from his parent: "When a young child is separated from a parent unwillingly, he or she shows distress.... At first, the child is very anxious and protests vigorously and angrily. Then he falls into a sense of despair, though still hypervigilant, looking, waiting, and hoping for her return ...." A child's sense of time factors into the extent to which a separation impacts his or her emotional well-being. Thus, for younger children whose sense of time is less keenly developed, short periods of parental absence may seem longer than for older People.

25. Dr. Stark asserted that if a child is placed in foster care as a result of domestic violence in the home, then he or she may view such removal as "a traumatic act of punishment... and [think] that something that [he] or she has done or failed to do has caused this separation."

26. Ms. Groves testified that when a child is separated from a mother because of domestic violence, the separation is even more traumatic, because the child "is terrified that a parent might not be OK, may be injured, may be vulnerable.... They feel that they should somehow be responsible for the parent and if they are not with the parent, then it's their fault."

27. Dr. David Pelcovitz concluded that removals heighten the child's sense of self-blame, and that children exposed to domestic violence are at a significantly above-normal risk of suffering separation anxiety disorder if separated from their mother. Ex. 139. Dr. Pelcovitz stated that "taking a child whose greatest fear is separation from his or her mother and in the name of

'protecting' that child [by] forcing on them, what is in effect, their worst nightmare, … is tantamount to pouring salt on an open wound."

28. Dr. Stark testified that foster homes are rarely screened for the presence of domestic violence, and that the incidence of abuse and child fatality in foster homes in New York City is double that in the general population. ; Children in foster care often fail to receive adequate medical care. Foster care placements can disrupt the child's contact with community, school, and siblings.

## I. PARTIES:

29. Plaintiff Allen Kutsy (PAK)(DOB 3/21/84), is a United States citizen who resides at 1751 Union St. Apt 2A, Brooklyn, NY 11213 and has at all relevant times resided in Kings County, New York which is in this judicial district.

30. Plaintiff Chana Duban (PCD)(DOB 12/6/86), is a United States citizen who resides at 1751 Union St, Apt 2A, Brooklyn, NY 11213 and has resided at this address at all relevant times

31. Defendant Administration for Children's Services (ACS) aka NYCCS is a governmental agency within New York City and part of  Department of Social Services/ Human Resource Administration. ACS offices located at 150 William St, New York, NY 10038

32. Defendant Cecilia Sheppard (CS) was at all relevant times incuding February 5, 2013 an employee of ACS. She is sued by plaintiffs in both her individual and official capacity. CS is employed as a child protection specialist at the Bedford Field Office at 1274 Bedford Ave, Brooklyn, NY, 11217 and she resides at 1134 St Johns Pl, Brooklyn, NY 11213.

33. Defendant "Jane" Samuels   was at all relevant times including February 5, 2013 an employee of ACS. She is sued by the plaintiffs in her official capacity. Ms. Samuels was a supervisor at the Bedford Field office at 1274 Bedford Ave, Brooklyn, NY 11217. Her first name being temporarily replaced with a fictitious one until plaintiffs become informed of her true name.

34. VERIFIED COMPLAINT- Defendant Ronald E. Richter (RR) has at all relevant times including February 5, 2013 been the Commissioner of ACS. The petition filed with the court was submitted in his name. He is sued   by the plaintiffs in his official capacity. RR's office is located at 150 William St, New York, NY 10038

35. Defendant City of New York (NYC),Attn: Corporation Counsel, 100 Church St., 5th Fl., New York, NY 10007

36. Defendant New York Police Department (NYPD) is a governmental agency within and part of the City of New York.   NYPD main offices are located at One Police Plaza, Ne Defendent 71st Precinct is responsible for the responding officers to plaintiffs' address listed above, which is within the confines of the 71st precinct. All the names of the officers involved are not known to the plaintiffs at this moment but may be included as defendant(s) Does 1-1XX . On the

evenings of January 30, 2013, February 5, 2013, and February 6, 2013 officer from the 71st precinct repeatedly violated PCD's Fourth Amendment rights by entering her home without a warrant or consent. 71st Precinct is located at 421 Empire Blvd, Brooklyn, NY, 11225

38.  Defendent Lueitenant "John" Worobey (LW) was at all relevant times including January, 30 2013 and Febraury 5, 2013 an employee of the NYPD in the 71st precinct located at 421 Empire Blvd, Brooklyn, NY, 11225. He is being sued by plaintiffs in both his individual and official capacity. His first name being temporarily replaced with a fictitious one until plaintiffs become informed of his true first name.

39. Defendant 79th Precinct is responsible for the responding officers, whose names are currently unknown nut may be included as Defendants Does 1-1XX, on the evening of March 6, 2013 when they aided ACS worker CS to summarily perform an unlawful seizure of the plaintiffs' two children Riva (DOB 4/24/10) and Yosepha (DOB 5/14/11) Kutsy (the children)(daughters), from the domestic violence shelter   where PCD was in compliance with conditions set forth in a Kings County Family Court order issued two days prior.

40.  Defendent Ohel Children's Home and Family Services (Ohel) is a corporation operating under the laws of the State of New York and is contracted to ACS and therefore operates under color of law for all relevant purposes. Their main office is located at 4510 16th Ave, Brooklyn, NY 11204

41. Defendent Kelly Sarway (KS) was at all relevant times an employee at Ohel and has been the supervisor of the plaintiffs' case since February, 2013. KS is being sued by plaintiffs in her official capacity. Her office is located at 4510 16th Ave 4th Fl, Brooklyn, NY 11204

42.  Defendent Elisheva Bercowits (EB) was at all relevant times an employee at Ohel and has been the case planner for the plaintiffs' case since October 8, 2013. She is being sued by the plaintiffs in her official capacity. EB's work address is located at   4510 16th Ave 4th Fl, Brooklyn, NY 11204

43.  Defendent Leoni Pludwinski (LP) was at all relevant times an employee at Ohel and has been the case planner for the plaintiffs' case   from May until October of 2013. She is being sued by the plaintiffs in her official capacity. EB's work address is located at   4510 16th Ave 4th Fl, Brooklyn, NY 11204

44.  Defendent Sylvia Madison (SM) is a skills instructor for the plaintiffs' children. She visits the children weekly at the foster home. SM was an employee of Ohel   at all relevant times and therefore acted under color of law for all relevant purposes. SM is being sued by plaintiffs in both her individual and official capacity.

45. Defendent(s)   "Does" 1-1XX. Plaintiffs do not know the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued as Does 1-1XX, and therefore sues these defendants by such fictitious names pursuant to Code of Civil Procedure section 474. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these defendants when ascertained, together with additional charging allegations as necessary. Plaintiffs are informed and believe that each of the fictitiously named defendants is legally responsible in some manner for the occurences alleged and for plaintiffs' resulting damages, and are being sued in their individual and/or official capacities.

46. At all times pertinent hereto, each of the defendants was the agent or employee of each of the remaining defendants and has ratified and/or approved the acts of the remaining defendants. At all times material to this complaint, each defendant acted or purported to act under color of the law, customs, and usages of the City of New York, New York.

47. At all times material to this complaint, each   of the defendants was the "moving force" behind the alleged deprivation as a result of them implementing or executing a policy statement, ordinance, regulation, custom, pattern , practice, or decision officially adopted and promulgated by each of the remaining defendants.

48. At all times material to this complaint each of the defendants was directly responsible for plaintiffs' deprivation of civil rights and the resulting injuries and physical, emotional, and monetary damages.

## II. The Jurisdiction of the Court:

49.Jurisdiction is invoked pursuant to 42 U.S.C. 1983

50. This case arises under the United States Constitution and the laws of the United States, and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution,

28 U.S.C. Secs:

a. 1331, which gives district courts original jurisdiction over civil actions arising under the constitution, laws or treaties of the United States;

b. 1343 (3) and (4), which gives district courts jurisdiction over actions to secure civil rights extended by the United States government;

c. 1367(b), which gives the district court supplemental jurisdiction over state law claims.

51. This case presents a federal question in relation to the following federal laws whose violation is being alleged:

a. Title 42 U.S.C Secs. 1983; 1985; 14141; 671(a)(15)

b.Title 18 U.S.C Secs. 1203; 2236; 1001; 241; 242.

52. Venue is proper in this district under 28 U.S.C. Sec. 1391(b) because the events that gave rise to this complaint occured in this district.

53. Exhaustion of administrative and judicial state remedies is NOT a prerequisite to a section 1983 action.

54. Existence of concurrent state remedies is not a bar to a section 1983 action.

55. Local governments have no immunity from damages flowing from their constitutional

violations, and may not assert the good faith of its agents as a defense for liability.

56. State law sovereign immunity and state law limitations on damages do not protect local governments under section 1983.

57. State laws requiring pre-suit notification prior to initiating an action against the state or its subdivisions DO NOT apply.

58. Qualified immunity cannot be claimed by the defendents in this case because their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."

59. A government official is not entitled to qualified immunity when his "act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who knowingly violating the law would have done such a thing."

60. Plaintiffs will point to case law which predates the defendants' alleged improper conduct, involving similar facts, to compel the conclusion that the plaintiffs' had a right under federal law.

61. The Supreme Court has held that the appropriate statute of limitations to be adopted in a section 1983 action for the recovery of damages is the state statute applicabe to personal injury actions which is three years in New York

62. The alleged deprivation and resulting damages in this case began in January 2013 and arc ongoing to date.

## III. Facts Common to All Causes

63. PAK and PCD are the married parents of two children RK and YCK who have been in non-kinship foster care with Ohel since February 2013.

64. There was an order of protection issued by Brooklyn Criminal Court on or around October 10,2013 ordering PAK to stay away from PCD. This was a result of PCD alleging that PAK hit her and having him arrested. This was six months before the children were removed.

65. During the arrest and the events leading up to it at around 1:00am on or around October 9, 2013 the children were sleeping in another room and were undisturbed. PAK's father was sleeping in the living room and can affirm that there was no noise or witnessed violence. PCD had no apparent injuries and did not require any treatment.

66. PAK's father Yan Kutsy(YK) moved to 826 Eastern Parkway, Brooklyn, NY, where PAK joined him following the incident. PAK resided with YK at the above mentioned address from around October 16, 2012 until February 14, 2013 and all the days in between.

67. This order was part of a conditional discharge wherein PAK agreed to plead guilty to an Attempted Assault charge on condition that the misdemeanor conviction will be vacated upon completion of a sixteen week Batterer's Intervention Program (BIP) which PAK had to pay twenty five dollars a session to attend and was not allowed to miss more than twice.The conditional discharge stipulated that upon completion of sixteen weeks of BIP the order of protection was to be modified to allow PAK to return home.

68. The order of protection was modified and the conviction was vacated on February 14, 2013

69. On or around January 30, 2013 LW knocked on the door of PCD at around 4:30pm at her residence 1751 Union St Apt 2A, Brooklyn, NY where PCD was home alone with the children.

70.LW announced that it was the police and PCD asked what he wanted. LW told PCD that she had to open the door to which she replied "Why? I don't want to." LW persisted banging on the door until PCD opened the door so the banging wouldn't scare the children.

71. Upon PCD opening the door LW began to push his way in. PCD tried keeping him out by standing behind the door but LW forcefully pushed PCD out of the way with the door while repeating that he has to come in because he needs to help her. PCD insisted that she doesn't need his help and doesn't know why he is there.

72. LW was joined by two or three other officers in forcing PCD out of the way and into her home thereby frightening PCD and her two young daughters. The names of the other officers are as of yet unkown to the plaintiffs but may be later included in defendants Does-1XX

73. LW and the other officer conducted a breif search of the apartment without clearly stating why they were there. LW questioned PCD about her husband PAK and whether she was safe. PCD said she was perfectly safe and that nothing was the matter. PCD stated that her husband PAK was not living at home at the time. LW filled out an incident report stating as much.

74. Shortly after the officers left her home, PCD filed an online complaint against LW with the Civilian Complaint Board stating that her rights had been violated.

75. On February 5, 2013 CS and Unknown (may be included in defendants Does-1XX) appeared at the home of PCD. They introduced themselves as employees of  ACS. CS stated that they are investigating a complaint and they have to come in and see the children. PCD asked about the nature of the complaint but CS only insisted that she must come in and see the children.

76. The children Riva Kutsy (RK) (DOB 4/24/10) and Yosepha Chaya Kutsy (YCK) (DOB 5/14/11) were two and one years old respectively at the time. It was around 7:30pm and PCD had just given the girls baths and put them to bed. PCD told CS that the girls just went to bed and she cannot see them that night.

77. CS became indignent and argued that PCD has to allow her in because she is ACS and she has to investigate all complaints. PCD told CS she will have to come back another day or get a warrant.

78. PCD could then hear CS apparantley making a phone call and saying "LW, she won't let us in. She said to get a warrant." PCD then heard CS tell Unkown "He said he can't come himself but he will send a few guys over."

79. CS and Unkown then began knocking on the neighbor's doors and questioning them about PCD and PAK. The neighbors all gave positive references which CS ommitted from her reports to the court. All the neighbors and dozens more signed a petition days later in support of PCD and PAK as parents and their belief that the children were not neglected in any way.

80. About ten minutes later the police arrived on the scene and pounded on the door. PCD seeing

the kids were not yet sleeping decided to convince CS and Unkowns that there was no need for concern. So to satisfy CS's curiosity PCD brought the children to the door to allow the ACS to inspect the happy girls and allow them to go back to bed without further disturbance.

81. When PCD opened the door there were about four, male and female, police officers whose names are unkown but may be included in Defendants Does 1-1XX. The male police officers began to push PCD in front of the children in order to gain access to the home. One child began to cry and CS began questioning why the child was crying. PCD explained that the police officers scared her. One of the female police officers began to calm the children and then complimenting them to PCD.

82. CS told PCD that PAK was seen leaving the building. PCD denied and denies any knowledge of that. PAK was several blocks away at the time attending a weekly lecture.

83. Meanwhile two or more officers, whose names are currently unkown but may be included as defendants Does 1-1XX, searched the apartment. When they came back to the door, where PCD was still with CS and Unkowns in the hallway, PCD asked the officers "So was I lying? Is he here?" The Officers responded "You weren't lying. He is not here"

84. CS told PCD that she will have to go to court the next day. Then everybody left and the children RK and YCK were left at home with their mother.

85. On or around February 6, 2013 PAK was notified by telephone around 11:00am that he was to appear at Brooklyn Family Court (BFC) at 330 Jay St at 2:00pm.

86. PAK arrived at BFC at around 2:00pm out of fear of violent retaliation against PAK, PCD, and children RK and YCK

87. At around 4:00pm the petition was finally prepared and an attorney was assigned to him. At the time PAK didn't know what he was waiting for or what was about to happen. PCD was not able to go to court because she had to pick up the children from school.

88. His newly assigned lawyer Julia Hiatt (JH), from the Brooklyn Family Defense Project (BFDP), informed PAK that ACS is filing a case against him and PCD. JH explained to PAK that ACS will now be in their lives for no less than a year, and they must cooperate with them, let them into their homes and do what they say. JH also notified PAK that ACS and CS are requesting for the children to be remanded and removed from the home and placed into foster care.

89. PAK was shocked and couldn't believe that any judge would just allow that to happen for no good reason. JH agreed that the petition was very vague and the request for a remand seemed inappropriate.

90. The petition was made up almost entirely of conclusory statements having no basis in fact, and wholly fabricated charges and allegations, hearsay,and ficticious statements. These fabrications included, but were not limited to allegations and assertions that:

a. father resides at the same address as the mother.

b. father perpetrated acts of domestic violence against the mother in the presence of the children

c. source of information being an anonymous neighbor

d. on January 30, 2013...father had already left the home.

e. observed father exiting the case address.

f. mother discontinued treatment for bi-polar

g. "mother stated...that she has mental health, she is not in services, and ACS is causing her to "freak out"

h." mother stated "it is her order of protection and she can do whatever she wants with it.

91. Plaintiffs had proven many of the allegations to be false before the children were removed. Each and every one of these statements is false, and known to be false at the time they were made or verified by the defendants.

92. The petition included Addendum III which put an "X" next to "Reasonabe efforts to prevent or eliminate the need for the above- described removal, were provided prior to the date of the hearing as follows: Imminent risk to the child would not be elimanted by the issuance of a temporary order of protection" Period.

93. On or around February 6, 2013 Honorable Judge O'Shea DENIED the ACS's, RR's, and CS's motion to remand the children. ACS attorney then immediately requested a 1027 emergency hearing which the statute requires be held within one day of it being requested.

94. JH told PAK after court that he and PCD must come to the same court the following day at 10:00am. JH told PAK that as long as PCD can prove that she is in fact compliant with her medication then the remand should be denied.

95. On or around February 6, 2013 at around 8:00pm CS arrived at the residence of PCD. This time CS had brought about eight police officers from the 71st precinct with her. When PCD opened the door she told them that they cannot come in without a court order. CS held up a folded paper in her hand and claimed she had a court order but refused to show it to anybody. The police officers names are unkown but may be included in defendants Does 1-1XX.

96. Several officers forced their way into the home of PCD for the third time that week causing PCD, RK, and YCK much distress, fear, and apprehension. They searched the apartment apparantley looking to catch PAK violating an order of protection before the hearing on the following day. CS and officers were seemingly disappointed.

97. The children were not removed at this time because obviously CS and NYPD officers from 71st precinct did not believe that there was any imminent, immediate, or impending danger to the children's life or health at that time.

98. On or around February 7, 2013 Plaintiffs were sitting in the designated waiting area for their hearing by 10:20am. PCD was delayed because she had to bring the children to school at 9:00am, and PAK was unprepared for the traffic and parking issues. Also there was a long line downstairs to get into BFC building.

99. CS added more false allegation although nothing had changed since the previous day's court appearance.

100. On or around February 7, 2013 was the only hearing to date in relation to this case that had started exactly on time and was concluded so swiftly. ACS's, RR's, and CS's fraudulent presentation to the court went uncontested as plaintiffs sat unsuspectingly right outside the court room.

101. At around 10:25am as Plaintiffs are waiting to be called into court JH comes out and notifies PAK that the Judge granted the remand and the children will be removed from school.

102. Plaintiffs were then called into court to explain why they had missed the hearing. Judge O'Shea (JOS) said she could not reopen the matter unless she gets a written request from plaintiffs showing good cause. PCD newly assigned lawyer Sharyn Duncan (SD) requested a 1028 hearing to request the immediate return of the children. This hearing must be granted within three days and held on consecutive days unless good cause is shown.

103. When PCD began to cry outside the courtroom CS told her that if only she would have let her into the apartment she would still have her children.

104. JOS Removal Order was tainted based on the misrepresentation by ACS, RR, and CS including but not limited to the following things in JOS's order:

a. mother fails to comply with the terms of the order of protection and that father has been seen in the home.

b. reasonable efforts...were: the commisioner provided the father with referal for batterer's program and the agency monitored mother's compliance with mental health treatments.

105. ACS was given a letter that PCD received treatment regularly at Interborough for more than five years when they claimed in the petition that she had not been attending Astrocare.

106. ACS did not have time to investigate or make reasonable efforts in less than a day.

107. Plaintiffs scoured the community to find a family in the neighborhood allowing the children to stay in their school and familiar surroundings. It was also important for the Plaintiffs as Hasidic Jews belonging to the Chabad- Lubavitch movement that their children remain with another Lubavitch family.

108. The court had ordered that the children not be separated and that PCD be allowed to visit them that same day at the ACS Bedford Field Office. The children were removed from school by CS and brought to be examined by a doctor as part of their intake process.

109. Plaintiffs requested in court that children be fed only kosher food. PCD brought the children a meal when she visited them at around 8:00pm at 1274 Bedford Ave, Brooklyn, NY. After the visit CS asked PCD if she would pick the children over her husband PAK. PCD responded that of course she would pick the children any day. CS smiled and said "good girl" as she continued to smoke her Newport cigarette.

110. The children were then brought to the Kohen family whom the Plaintiffs had found to care

for their children for what was then expected by the Plaintiffs to be just a few days.

111. Less than a week later CS notified plaintiffs that the Kohen family was not approved because they had too many children(ie. four) under a certain age. At this point ACS and CS had handed the case over to Ohel. Ohel is contracted to ACS for the purposes of being the "agency" in regard to foster care; usually for Jewish families.

112. On or around February 11, 2013 at about 8:00pm Ohel case planner Shulamit Marcus (SHM) arrived at the Kohen residence at Albany Ave, Brooklyn, NY and tried to take the children away to a "proffesional" foster family in a different neighborhood. The Kohens defended the best interests of the children and refused to allow SHM to take them, insisting that the girls remain in Crown Heights. It was already late so SHM allowed the children to remain the night.

113. On or around February 12, 2013, PAK reached out to community leaders (Hecht, Shemtov, Kohen) and an employee of the State Assembly (Lipkind) to do whatever is in their power to keep the children with a Lubavitch family in Crown Heights. The children were brought to the Simon family in Crown Heights.

114. The children were moved shortly after  to the Brussowankin family in Crown Heights. Children are currently residing with the Brussowankins at Empire Blvd, Brooklyn, NY and are being well cared for.

115. On or around February 13, 2013 PAK was able to visit with his children fro the first time since they were removed. RK ran to her father PAK and wrapped herself around him. The visits began to take place regularly supervised at Ohel whereing plaintiffs had to visit seperatley, for one hour each Monday through Friday. Plaintiffs never missed a visit or came late throughout the duration of this case.

116. In February of 2013 there was a meeting held at Ohel where CS officially breifed up that she was handing the case over to Ohel. KS, SHM, CS, and plaintiffs participated in this meeting.

117. Plaintiffs expressed concerns that they would rather deal directly with ACS. The reason for this was the Plaintiff's belief based upon information that although Ohel operates under the guise of a Jewish agency there are allegedly cases of Jewish children being sent to Catholic schools by them.

118. KS and SHM had no comment. CS reassured plaintiffs by saying that Ohel could not do that without terminating our parental rights.

119. On or around February 13, 2013 in the evening time, CS performed a home visit. This was the first time that PCD allowed her to come in. Because the children were in custody PCD felt compelled that she had no choice but to cooperate with ACS if she wanted to get her children back.

120. CS arrived at CDK's residence with the same Unknown mentioned on February 5, 2013. PAK arrived after CS to participate in the visit since he was now allowed to.

121. During this visit CS spoke to CDK about herself. She told plaintiffs about

a. her "baby daddy" and how she is better offf without him.

b. her baby daddy is in California..."good riddence"

c. her eleven year old son and her younger daughter never see her at home. She tells them she is "Kiddie Cop"

d. her manicure

e.her Christian beliefs and observance, participation in church, how similar her beliefs are to ours, and her declaration of faith in Jesus Christ.

122. CS also commented to Plaintiffs how beautiful their home was. CS tols plaintiffs that she is sure that they are good parents and love their children.

123.CS did NOT speak to Plaintiffs about, or show any concern for,   their children except to say that they would not have been seized if only PCD would have allowed CS to enter her home without a warrant.

124. Plaintiffs were disturbed by CS's inappropriate and unproffessional behavior which was felt to be unbecoming of her official capacity. Plaintiffs felt that CS was openly attacking their religious beliefs acting under color of law ,in their own home, yet feared to respond out of fear of violent retaliation.

125. PCD's 1028 hearing began on or around February 14, 2013 with Hon. Ilana Gruebel (HIG) presiding in Section Eight of BFC. PAK was present to support PCD application for relief and was agreeable to leave the home for the sake of the children's return. This was in spite of the Order of Protection being modified to allow his return home the day before.

126. PCD's 1028 hearing was not granted within three days as the statute demands, thereby denying PCD's right to a speedy hearing.

127. During the hearing CS testified, under oath and penalty of perjury, to several fabricated and purposefully misleading reports. CS's testimony willfully and knowingly omitted exculpatory evidence, as well as a lot of "making it up as you go" in order to defraud the court into prejudging the plaintiffs in the most negative possible way and contrary to what she herself knew to be true.

128. CS false statements incuded but are not limited to:

a. she saw PAK leaving the case apartment when at 1027 hearing she said she saw PAK leaving the buliding but couldn't see the apartment)

b. PAK was chased by police officers for three blocks who were unable to catch him even though she claimed that she had only called the police after she saw him leave.

c.that PCD's therapist (whom allegedly she wasn't seeing as stated in the petition) reported that PCD is not fit to be a mother and that she intented to lie to the court and that Plaintiffs live together.

d.that Director of Beis Rivka Benji Stock (girl's school for RK and YCK) alleged that "no man

should beat his wife like that...the whole community knows..enough is enough"

e. that PCD was psychiatrically hospitalized in August because she couldn't cope with the children by herself after the order of protection was issued (the one that was issued in October three months later).

f. that the children did not look well fed, clothed or welll taken care of. (That is not true and was never mentioned anywhere else ever)

g. that mother denied having an order of protection or her need to comply with it.

129. PCD's medicine was being adjusted and PAK took care of the kids for two weeks singlehandedly.

130. PCD had recently switched therpaists at Interborough for a few weeks before returning to her previous therapist. The man CS spoke to only knew PCD for a few weeks. When PCD confronted her therapist he said:

a. "I told her I didn't know there was a situation between you and your husband until ACS brought it to my attention"

b. "I told her I think you are a good mother. I'm a father too and I hope you get your kids back very soon."

c. "I told her I am only your therapist for a few weeks and you were seeing somebody else at the clinic before and haven't opened up to me so much yet"

d. "she [CS] is a f#@$ing liar" (that is from a recorded phone conversation)

131. Mr. Stock told Plaintiffs that he had never spoken to CS and does not know who she is and that he doesn't know the Plaintiffs either.

132. The law provides procedures to follow to protect children without the need to go outside of it. No investigation was conducted, no reasonabe efforts were made, no service plan was offered, no conference was held.

133. The 1028 hearing was not granted on consecutive days. CS's testimony consumed three andjournments over the course of three weeks. Each court appearance was approximatley thirty minutes.

134. PCD's testimony as prepared by SD was no more than fifteen mintutes. Due to the court's time restraints HIG cut off the the lawyers for the defense JH and SD in the middle of there closing arguments which were breif to begin with. HIG also cut short the argument of the counsel for the children Deanna Everitt-Johnson (DEJ) who was in support of PCD's application for immediate relief.

135. During the hearing CS attempted to present hearsay in the name of an employee at YCK's school, who is not known to the plaintiffs. CS began to say that this Unkown heard a rumor about PCD. SD objected on the grounds of several layer of hearsay as opposed to admissable hearsay.

136.   HIG sustained the objection. CS continued where she left off. HIG interrupted CS and corrected her "Sustained means you don't answer the question" CS apologized and then proceeded anyway to say the rumor that Unknown heard.

137. Not only did HIG allow the hearing to continue as if nothing happened, but she actually included this peice of hearsay in her decision although she had sustained the objection that it wasn't admissable.

138. On or around   March 1, 2013 HIG granted PCD's application however the order was stayed until 5:00pm of March 4, 2013.

139. HIG's decision for PCD's 1028 hearing set forth several conditions for the return   of the children to her care. Such conditions included but are not limited to:

a. mother is to enter domestiv violence shelter (DVS) loacted at a confidential location

b.mother is to abide by temporary order of protection issued herein which prohibits contact between the children and the father...

c. ACS shall assist mother in locating appropriate services including those which are appropriate based on the mother's religious observance.

140. These conditions were difficult, unnessary and detrimental to the well being of the entire family who forced to leave their home. It seemed to plaintiffs that although HIG felt compelled to uphold the law by releasing the children, she simultaneously placed conditions that would almost certainly and needlessly make reunification as difficult as possible. HIG summarily set PCD up to fail.

141. PCD complied with every condition set forth by HIG.

142. On or around March 4, 2013 CS transported PCD from her residence with several bags of her belongings to Ohel to pickup her children. From Ohel CS transported PCD and children to Prevention Assistance and Temporary Housing (PATH) located in Bronx, NY

143. PCD, RK, and YCK arrived at PATH at around 8pm. At around 12:00am PCD and children were transported by school bus to a motel with hospital like beds.

144. On or around March 5, 2013, at around 7:00am PCD and children were returned to path via school bus. While at PATH PCD was forced to go from floor to floor with the children and her belongings. PATH provided some food which was not kosher and therfore forbidden to PCD. PCD was barely allowed to leave the building to buy potato chips at the corner store but was not allowed to bring any food back into the building.

145. PCD and children remained at PATH awaiting to find placement at a DVS the entire day. At around 11:30pm PCD and children were again transported via school bus to a motel in Queens for the night. On or around March 6, 2013 PCD and children were returned to PATH at around 8:00am where they repeated the whole process for the third consecutive day.

146. During this time PCD recieved repetitive phone calls from foster mother (FM) expressing her concern for the children. FM tried to pursuade PCD that exposing the children to living in a

shelter would be a terrible thing. PCD was reluctant to agree but fet it more harmful to the children to be seperated from their mother. She was after all complying with the HIG's order.

147. PCD complained to CS about the difficult conditions and pointing out ACS' being ordered to find her placement and kosher food. CS blamed PCD for her situation.

148. On March 6, 2013 PCD was told that there would be a place available for her in Staten Island, NY on the next day. PCD and children were transported to a DVS on Lafayette St. in Brooklyn, NY where they were to remain one night before being moved to Staten island in the morning.

149. PCD took the children grocery shopping then returned to the DVS and fed them supper. PCD proceeded to give the children baths, dress them in their pajamas, and tuck the two exhausted girls into the one bed available for them

150. The DVS had no heat and the room was extremely cold. PCD became despondent after the challenges of the previous few days, but looked forward to finally being able to settle down with the children the next day.

151. At around 6:00pm PCD spoke on the phone with SD. PCD complained to SD how difficult it had been so far. PCD stated to SD in confidence that she was feeling overwhelmed. SD began to pursuade PCD that she should return the children voluntarily and that the judge would understand and that it would not hurt her case.

152. PCD breifly agreed with SD's arguments not understanding the ramifications of doing so. PCD tried calling SD back ten minutes later and left a voicemail to clarify that she was not actually interested in returning the children to foster care and that she was just venting and the kids were already sleeping and doing fine. SD never returned her call that day.

153. On or around March 6, 2013 at around 10:30pm CS arrived at the DVS where PCD was staying. CS was accompanied by several police officers, whose true names are not known but may be included in Defendants 1-1XX and, who were believed to be from the 79th precinct.

154. CS told PCD that she was taking the children. PCD responded that the children were sleeping. PCD refused to give consent but the police officers went upstairs and took the girls out of bed and brought them to the ACS van waiting outside. RK began crying for her mother.

155. CS and police officers conducted a removal of the children RK and YCK without a court order, and without consent, and without exigent circumstances. PCD was in full compliance with HIG orders at all times. CS notified PCD to come to court the following morning.

156. On or around the morning of March 7, 2013 plaintiffs arrived early and waited the entire day for their chance to be heard thinking the judge would be outraged by this unlawful behavior only two days after a decision had already been issued. Especially after being informed that the presiding judge was HIG herself.

157. CS had reported additional allegations which were completely fabricated and can easily be proven to be absolutley false. Especially considering that PCD had been at PATH with her children the whole time since they were returned to her. Fictitious reports included events that

allegedy took place before the children were returned which had no relevance to the illegal seizure of the children RK and YCK on or around March 6, 2013 including but not limited to;

a. Ohel would not take the mother and her children into their shelter because mother would most probably disclose their location.

b.on or around March 4, 2013 Orthodox Jewish shelter in Far Rockaway stopped the telephone intake appointment because of father's presence during the intake process. (Allegedly they heard a male voice which is a moot point since there was no order at the time barring PAK from the home.)

c. Shalom Volunteer Ambulance Service was called to   the home and reports from "Gadi Hirshop" about and incident that took place before the children were returned.( There is no such thing as Shalom Ambulance and Mr. Hershop is unknown to the Plaintiffs, and none of the reports had any truth to them)

d. Mr. Hershop allegedly told CS that he has seen domestic incident reports on the Plaintiffs going back seven years although paintiffs had only been together for four years at the time.

e. PCD allegedly verified these events with CS in the car when she spoke to Mr. Hershop on the phone

158. CS admitted in her affidavit that the reports of PCD being overwhelmed, going crazy, and that she no longer wants to care for the children was in fact based on a communication between ACS and SD.

159.Plaintiffs spoke to SD and explained that the children should not have been taken. SD said she would try to explain to judge. Plaintiffs presented themselves in front of HIG at around 4:00pm. The hearing lasted no more than ten minutes. SD and JH presented no argument and HIG rubberstamped the removal.

160. HIG wrote on the Removal Order for one RK that "mother is UNWILLING" to live with the children seperate from the father when in fact:

a. PCD was willing and in compliance.

b. PCD was aso forced to leave her home with the children in order to go live like a homeless person

c. the order for YCK says mother is "unable" instead of "unwilling" which is also not true and not consistent

161. HIG wrote   that "the agency attempted to provide the mother with a DVS but the mother refused". That is contrary to the facts of what actually took place and had the Judge been presented with the true facts it may have very well changed her decision.

162. HIG issued a temporary order of protection barring PAK to have any contact with PCD or the children except supervised visits. This order was not requested by anoybody and was    . protested by PCD in the presennse of HIG.Plaintiffs were rushed out of court before they had a chance to realize what was happening.

163. SD's only argument was that the removal be considered voluntary because PCD had called before. According to SD this gesture would make a more positive impression on the seemingly indifferent judge.

164.   PCD was manipulated and betrayed by SD who failed to represent PCD the way she requested during every step of these procedures. PCD failed to request for more adequate representation out of fear that it might slow down the process of having her children returned.

165. PAK received a certificate for the completion of the Batterer's Intervention Program in April 2013

166. On or around May 1, 2013 PAK began individual therapy at Interborough Clincic on East New York Ave, Brooklyn, NY with therpaist Mr. Edward Gold on a weekly basis as part of his service plan.

167. On or around May, 2013 JH made a motion on behalf of PAK requesting that

a. Plaintiffs should be allowed to visit children together not to give them the mistaken impression that thier parents aren not committed to each other.

b.to modify Order of protections on consent on the grounds that there were never any allegations of abuse towards the children and PCD did not want or need it.

c. permission be granted for a special visit in the synogogue with plaintiffs and children in honor of holiday Shavuos and YCK's birthday.

168. PCD was psychiatricly hospitalized   right around the time this motion was filed. JOS modified Order of Protection. This allowed for PAK to visit PCD in the hospital. All other requests were denied.

169. PCD provider for medication at that time was Sophia Mason at Interborough. She had submitted a letter to the court during PCD's 1028 hearing in February, stating:

a. PCD's compliance with all treatment

b.Nurse Mason's personal experiences with PCD and children during sessions.

c. she had no concerns about children's care or safety.

d. detriment to mother that seperation from her children would cause

e. PCD's slurred speech is a side effect of her medication and not as CS claimed in her testimony that it was because of a broken jaw which she based on a rumor that was repeated to her by Unknown.

170. Nurse Mason (NM) became concerned about this side effect and therefore decided to revert her back to the medication she was prescribed before her pregancies three years prior, since CDK did not intend to get pregant at this time.

171. PAK advised NM that he didn't think it was a good idea at this moment to play with the medication because of the situation with ACS. It usually takes weeks of trial and error and a few

hospitalization whenever there are any changes made to the medication.

172. This change led to CDK's three consecutive hospitalizations beginning from the end of May 2013 and the last one being on June 23, 2013. CDK's mental condition has been stable since her last hospitalization in June 2013.

173. In June 2013 plaintiffs were allowed to have seperate community visits with the children on Saturdays (Shabbos) with the FM supervising. These visits were wonderful and much appreciated by the plaintiffs.

174. On or around June 22, 2013 PCD had a Shabbos visit with the children in the park from 4:00 - 4:45pm. PAK's visit began at 4:45pm. PCD seemed cheerful when PAK arrived for the visit. PAK asked her if she wanted to remain nearby so that they could go for a walk after hs visit. PCD agreed.

175. Twenty minutes later PCD approached PAK during his visit and was crying. PCD then removed YCK from PAK's shoulders. PAK saw that PCD was saying irrational things and was obviously upset, so he took the children by the hand and walked them over to the FM.

176. FM said she had to end the visit and asked her friend to bring the children home. RK didn't want to go home and hid behind FM and tantrumped to avoid going home with this Unkown.

177. Shabbos community visits were forthwith suspended. Although shabbos visit were instead of what used to be Wednesday visits, our Wednesday visits were not reinstated. Instead extra time was added to the remaining three visits.

178.Plaintiffs and foster family perfered to have visits supervised in the community for the sake of the children not spending over an hour in the car when the plaintiffs live just a few blocks away. Ohel insisted on having the visits in a small room at their agency.

179. Plaintiffs always brought snacks for the children but Ohel demanded that plaintiffs feed the children a full supper during visits so the FM wouldn't have to. Plaintiffs happily complied and brought a homemade meal for every visit.

180. On or around June 23, 2013 PAK travelled to Monticello, NY where he works as a driver during the summer months. PAK would return to the city on Thursday to attend Anger Management at Interborough and then visit with his children at Ohel later in the day.

181. PCD completed Parenting Skills and Domestic Violence therapy in June 2013.

182. On or around July 9, 2013 ACS decided they are going to suspend all visits between plaintiffs and children because of the incident that allegedly took place on June 22, 2013. They notified Ohel of this intention and ordered them to suspend all visits immediatley.

183. On or around July, 10, 2013 Ohel held a meeting with CS, KS, LP. PAK and CS's new supervisor whose name is Unkown were conferenced into the meeting via telephonc. PAK protested that the visits are not allowed to be changed without first making a motion to the court. CS's new supervisor told CS that she had to check with legal first. CS returned a few minutes later telling PAK to be in court the next day.

184. PAK filed an official complaint with ACS Advocacy Representitive Faye Moore againts CS in June 2013. PAK believes that CS being given a new supervisor may have been a result of his complaint. PAK believes that had it not been for this new supervisor CS had every intention of suspending all visits between the plaintiffs and their children, acting once again without court approval.

185. PAK also believes that CS's delayed reaction to suspend visits only two weeks after alleged incident was in fact retaliation for CS become aware of the complaint. PAK bases this belief on threatening comments made by CS to PAK in the waiting area of the courthouse on or around July 11, 2013 which PAK then reported to Faye Moore.

186. At the conference held on July 10, 2013, KS stated that SM reported that children were saying

a. "We don't want to see Mommy and Tatti (daddy)"

b."We don't want to visit"

c. and she also stated the children haven't been asking about the Plaintiffs at all.

187. When PAK had his visit with the kids for the first time in two weeks on July 12, 2013, and only after the Judge insisted on it, the children were extremely happy to see him. They both ran to PAK and gave him hugs. They spent almost the whole remainder of the visit sitting on PAK's lap which is unusual as they usually prefer to be more independent. Every five minute they asked about their mother and when they will see her and that they want to call her and talk to her on the phone.

188. On or around July 11, 2013 CS submitted a report to the court alleging incidents that took place on June 22, 2013. This entire report is inaccurate and should have been refused on the grounds that it is completely made up of third or fourth hand hearsay. CS included affidavit which stated her information was based on a report from Ohel case supervisor KS, who heard from FM, that plaintiffs said so and so.

189. KS intentionally and willfully misconstrued her reports to better serve ACS's agenda knowing that it would be submitted to the court and prolong the time that the children are being wrongfully seperated from their parents.

190. CS ommitted that KS stated at Family Team Conference held a week earlier that PCD's visit on June 22, 2013 went very well, even better than usual. KS claimed that FM reported that PCD was very cheerful and involved during that visit. By omitting this information it leads the court to assume that what happened next was a direct result of an act committed by PAK earlier that morning, and that there was no interuption in between making KS's scenario more believable.

191. CS and KS also ommitted that all the visit since the alleged June incident have went well, and chidren were always happy to see their parents and spend time with them. Knowing this to be true leaves no room for doubt that CS, KS, and SM conspired together to falsify information provided to the court thereby defrauding the court and prolonging the plaintiff's deprivation of their most basic civil rights.

192. Plaintiffs had a guest Noah Solow staying with them for several weeks including the morning of June 22, 2013. Noah Solow can attest to anything that may or may not have happened on that morning in diametric contradiction to CS's, KS's, FM's report.

193. The outcome of the Family Team Conference was to increase PAK's almost-completed service plan by adding Parenting Skills and and marriage counseling as a result of the alleged June 22nd incident although no allegations were ever made of any inappropriate actions taken by PAK during that incident.

194. Ohel employee SM is said to be a skills trainer. She visits the children for "sessions" at the foster home. During these sessions she attempts to play games with the children and advise the foster parents on parenting skills.

195. CS reported that KS reported that SM reported that FM reported that RK deficated in a waste basket in the bathroom a few days following the alleged incident on June 22, 2013. According to SM this is because of what RK witnessed occur between plaintiffs a few days prior.

196. SM reported that during a session a week after alleged incident RK was crying and inconsolable for forty five mintues. SM reported that children do better the less they see their parents. Such statements are clearly malicious and contrary to expert opinions provided in previous well known cases by proffessionals actually qualified to make such opinions.

197. Although SM has no knowledge of the plaintiffs, no direct knowledge of the facts of this case, and no first hand knowledge of what actually occurs or doesn't occur during visits, and no qualifications to make psychological determinations, she continues to making damaging and purely speculative analysis in her submissions to the court.

198. SM flaunts to be a psychologist but refuses to answer why she would omit that credential from her letterhead.

199. SM continued to state with some degree of authority and knowledge, which she doesn't possess, that all of the children's setbacks are a result of plaintiffs' actions which she has no direct knowledge of.

200. SM says the children, and especially RK, makes certain statements against their father PAK. Plaintiffs have never heard children ever relating such ideas. PAK is a loving father and his relationship with the children is warm and affectioniate.

201. SM supports the children staying in foster care because she claims that the children have developed and progressed as a result of foster care.

202.   The fact that the children are a year older and that they were viciously torn away from their mother and tossed around to three different families before SM met them didn't seem to play a factoring role in her understanding of the situation. SM also seemed to ignore the most obvious factor relied upon by experts that the trauma the children are experiencing is not a delyaed reaction from visits with their parents but rather the seperation of the children from the parents.

203. Contrary to ACS's position, Ohel did not believe that all the visits should be suspended but

rather that there should be only one visit a week. KS and LP argued that it was too difficut for the children to suffer the long hours and travel time.

204. Ohel, KS, and LP were responsible for the travel time by forcing the visits to be at Ohel and therefore demanding stringincies not imposed by the court and making conditions for the family as difficult as possible and preventing speedy reunification.

205. The lenght of the visits was also a result of Ohel, KS, LP not replacing the Shabbos visit back to Wednesday for which they argued that the frequency of the visits was too difficult for the children.

206. JOS scheduled a hearing   for some time in August because ACS insisted on it in spite of JOS declaring that she saw no cause to suspend the visits and denied ACS interim release. JOS ordered the visits to remain unchanged.

207. Jeff Blank(JB) is a supervising attorney at BFDP and replaced JH on around July 11, 2013 as counsel to PAK.

208. JB explained to JOS that because PAL is working upstate for the summer he is only attending visits on Thursday and that PAK would resume regular visitation at the conclusion of the summer.

209. JB pointed out to JOS that because of the hearing PAK had missed his weekly visit and also the visit of the week before because it was July 4th. JOS ordered that PAK should not have to miss his visit and Ohel should arrange for a visit first thing the next morning.

210. On or around July 17, 2013 PAK had a psychiatric evaluation completed at Interborough with Nurse Emma as per the requirements of his service plan. No further treatment was recommended.

211. When PAK returned home a few weeks early in August 2013 he wanted to resume his usual visits which he had been voluntarily missing due to work. Ohel refused to allow him to regular visits for three weeks. Ohel claimed that the court ordered only Thursday visits until the end of the summer, when in fact it was PAK that notified the court of his job, and obviously did not intend to miss visits if he was not upstate working.

212. On or around September 15, 2013 PAK was told by LP that ACS requested him to undergo a random drug test to which PAK agreed. LP told PAK that ACS had sent over the voucher. On or around September 16, 2013 PAK arrived at the designated loaction to deposit his urine analysis at around 11:30am. The clinic had not recieved any voucher.

213. PAK made several phone calls to LP to contact ACS to send over the voucher. LP claimed several times that she spoke to ACS and they claimed to have faxed it and will fax it again. After 1:00pm there was still no fax and no voucher so PAK asked LP if they could e-mail it to the clinic instead. LP said that ACS would e-mail it.

214. By 2:15pm the clinic still hadn't recieved the required paperwork from ACS. Finally LP recieved the e-mail from ACS which she then forwarded to the clinic. LP related to PAK later that day "No joke, those people don't know how to use a fax machine or send an e-mail."

215. On or around September 24, 2013 ACS claimed that PAK tested positive for use of cannabis. The actual results of this test have never been revealed to PAK or the court and are based soley on the word of CS. There were never allegations made of drug use to begin with to warrant ACS's request for PAK to submit to a drug test.

216. On or around September 29, 2013 PAK witnessed two African American men outside his building putting up flyers with swastikas and graffiti of swastikas on the sidewalk. The flyer with the swastika also included the logo of the NYPD. The location of these signs was for the purpose to incite hatred and violence in a racially charged atmosphere of where the Crown Heights riots took place.

218. PAK called 911 to report a hate crime in progress. He left is name and address. Then PAK followed one of the men for about two hours as the Unkown put swastikas up all over the neighborhood. During these two hours PAK called 911 about six times. PAK was surprised that for a location that is usually brimming with police and several recent shootings he could not spot one police officer for two whole hours.

219. PAK found two officers and told them his situation. The officers responded that they were transit police and cannot deal with non-transit issues. PAK found two more officers that he waved down and told them his situation. They responded that they were members of the 77th precinct and that they didn't have jurisdiction across the street.

220. On or around October 2, 2013 this same Unkown man who was putting up swastikas around town put up another sign with his picture and his phone number and a letter of apology to the "good white Jews" for the swastika and includes a message to the 71st precinct: "Inspector Lewis, thanks for the loving advice to write this apology. LW, thanks for the peaceful advice to write this apology...herein recommend Inspector Lewis and LW for promotions...there are two types of white Jews: Good; Evil."

221. The fact that LW and 71st precinct know the identity of this man and allow him to commit hate crimes while failing to act on the complaint of concerned Jewish citizen who made six 911 calls that were never responded to, shows to the patterns and practices of LW, 71st precinct, NYPD, and NYC in depriving a group of citizens of their right to safety in their pursuit of life, liberty, and happiness due to discrimination based on their religious beliefs.

222. Several adjournments resulted in that the visitation hearing, Permanency Hearing, and the long awaited fact-finding hearing were all scheduled to be held on or around October 8, 2013. Presiding JOS aplogized to the plaintiffs after about thirty minutes into the hearing that her calander was mistakenly double booked and there would not be time to have a fact finding hearing that day.   JOS offered a day in December that was rejected by the ACS attorney. JOS then offered a date in November but that also didn't work for one of the attornies.

223.All parties were then rushed out of the courtroom having reached a consensus on visitation that plaintiffs would finally be allowed to visit their children together.

224. The attornies for all parties continued their hearing in a back room until JB informed PAK that the fact finding hearing will be May 8, 2014. The decision of the permancey hearing was that the goal of the case is,was, and continue to be reunification.

225. JB assured PAK that as soon as he finished anger management and parenting skills that JB would be able to have the kids returned home before May since PAK still had a right to a 1028 hearing.

226. LW was in BFC on or around October 8, 2014 talking with CS. Apparenty he was planning to testify at the scheduled fact finding hearing but was not given the chance.

227. LP prepared and submitted the Permenancy Hearing Report on or around October 8, 2013 to the court. This report contained numerous unsubstantiated inflamatory comments as is typical with the tricks and schemes of Ohel and ACS. LP prepared this report for the original date of the hearing which was supposed to be September 24, 2013. During the two extra weeks of adjournment LP had become aware of facts that shoud have been changed in the report and yet they were not.

228. LP willfully ommitted exculpatory evidence from her report as a result of her behaving under the customs, patterns, practices and directives of KS and Ohel. SM's biased and unqualified comments and opinions have made their way into LP's and every other report throughout the duration of this case.

229. Some examples of LP's misleading and false presentations to the court include but are not limited to statements that:

a. mother not taking steps to protect herself and her children

b.mother has expressed the father continues to hit her.

c.father makes light jokes when told about symptoms his children are exhibiting due to their exposure to trauma.

d. agency has made all scheduled supervised visits possible.

e. father has not submitted to a random drug screening

f. mother lacks some parenting skills (eg.: preventing unsafe bahvior, responding appropriately to children).

g. mother reported she feels she cannot take care of her children alone.

h. mother has not taken measures to make herself safe from the abuse thereby has not taken steps to ensure her children's safety.

i mother has been resistant and non-committal to DV counseling.

j. parents fighting in front of the children in a visit

k. parents behaved in an unsafe manner in front of the children.

l. chidren consistently express their unwillingness to attend the visits prior to coming.

m. listed "neglect of child" as a mental health diagnosis for the children

n. RK had been approved for therapy and IEP services and then LP wrote that RK was not eligibe on a different page.

230. Every one of these statements made and verified by LP is false and known by LP to be false at the time that she submitted them to the court.

231. EB became the new case planner for plaintiffs' case at Ohel on or around October 8, 2013. Chaya Schwarcz (CS) (may later be included in defendants Does 1-1XX) became the supervisor in KS's stead, and KS was promoted to be CS's supervisor.

232. JOS order dated October 8, 2013 stated that plaintiffs should have one visit together with the children for two hours a week and that the plaintiffs shold have an additional visit in which they will visit the children seperately for two hours each.

233. Ohel insisted that the seperate visits be only one hour each and therefore Ohel, EB, and KS deprived plaintiffs of two hours of visitation every week since October 8, 2013, in violation of the order issued by JOS

224. Plaintiffs began to attend marriage counseling on a weekly basis beginning at the end of October.

225. On or around November 1, 2013 PAK began parenting class at Paul J Cooper in connection with an overall outpatient chemical dependency clinic. PAK was requested by Ohel and ACS to complete a drug program that included random UA as a result of the alleged failed drug test in September.

226. Ohel insisted that the court ordered PAK to attend drug treatment although the court never made such an order. PAK complied anyways as it was the only way for him to attend the parenting skills program as well. PAK submitted UA samples every week throughout the duration of the program in addition to daily breathalyzer tests. Every single test was negative for any illicit substances or alcohol.

227. On or around November 7, 2013 PAK recieved a certificate upon successfully completing Anger Management and Domestic Violence Therapy at Interborough as was required by PAK's service plan.

228. Upon completion of Anger Management PAK requested that JB file for a 1028 hearing on his behalf. JB filed the request on or around November 25, 2013. The hearing was scheduled for December 3, 2013 which was not within three days and therefore denying PAK's statutory right.

229. On or around December 3, 2013 the hearing was adjourned for another week as a consequence of SD's failure to arrive on time thereby further denying PAK's right to a speedy hearing.

230. On or around December 10, 2013 Plaintiffs began to attend family therapy on a weekly basis together with the children. This therapy was conducted at Interborough by therpaist Mr. Eli Klein, also the marriage counselor.

231. Ohel and EB presented the Plantiffs with a lot of difficulty in scheduling this court ordered family therapy. It took over a week and five attempts to arrange a time with the the therapist that

Ohel found to be acceptable for the children. For example: Ohel couldn't provide transportation on weekends. EB stated that children could not leave school because that made them feel different, and the children couldn't do it in the evening because they would be cranky, and they couldn't do it Monday or Thrusday because that is when we had agency visits.

232. Everytime Plaintiffs arranged a time with Mr. Klein it would take at least two days to confirm with Ohel. There always seemed to be a miscommunication between what EB was saying and what everybody was is saying. After having arranged for a time and attending one session of family therapy EB told PAK that the children shouldn't come every week. EB's reason was that Ohel doesn't want us to have an extra visit with the children. EB told plaintiffs that if they don't attend family therapy WITHOUT the children, in addition to their marriage counseling then EB would have to report their non-compliance with the service plan. Plaintiffs were able to resolve this absurdity after two weeks of playing "telephone" and family therapy continues every Tuesday.

233. PAK's 1028 hearing commenced on or around December 11, 2013. EB testified on December 11, 2013 and December 19, 2013. ACS and CS were not present at this hearing at any of its three adjournments including the hearing's conclusion on January 13, 2013 with the testimony of PAK.

234. On December 19, 2013 plaintiffs and all parties were delayed thirty minutes from the allotted ninety minutes for the hearing that day while waiting for SD to arrive. SD delayed PAK's 1028 hearing for the second time that month. The hearing was obviously NOT held on consecutive days as per 1028 statute.

235. EB could barely answer one question directly during her testimony. EB woud stall and refer to her notes for minutes at a time and still fail to answer the questions or provide details or dates.

236. EB testified that all of PAK's provider are giving negative reports about him not taking responsibility etc. PAK submitted strong letters of support from every single provider in response to EB's misleading claims.

237. EB admitted during her testimony that SM's only source of information as to how plaintiffs visits go with their children is EB.

238. EB testified that plaintiffs are constantly arguing during visits but could not remember what they argue about. Judge Alan Beckoff questioned EB about anything that may stick out in her mind that may have occured during the previous week's visits. EB refered to her notes, stalled for five minutes, and then answered that the last week is not in her notes yet.

239. EB gave examples of plaintiffs' arguments ie.

a. PAK commented to PCD that she should have brought a spoon for the children's applesauce instead of a straw;

b. PAK questions PCD by asking her "How do you know that? Where did you hear that from?"

c. PCD was laughing uncontrollably and PAK asked her to "Please stop because its bothering me"

d. PAK will say something and PCD will just give in.

e. Plaintiffs argue together against EB.

240. Not only do the Plaintiffs not argue during the visits, but the visits have always gone extremely well from their end. Plaintiffs love their children and the children love their parents. The visits are full of activities, such as learning, coloring, painting, reading, singing, dancing and playing. Plaintiffs' relationship and marriage have improved and become stronger.

241. Since EB became the case planner she has been interfering and interupting visits making it very difficult for the plaintiffs. If Plaintiffs don't agree with EB she accuses them of arguing.During visits EB and her intern Natalie "Doe" (may be included in Defendants Does 1-XX):

a. told PAK that he is not allowed to put his daughter in his shoulders because it is not safe. She would not allow the visit to continue until he removed his daughter from his shoulders.

b.told PCD must cut the grapes in half  for the children even though they know how to eat grapes.

c. make plaintiffs move rooms in the middle of a visit with their belongings.

d. alleging that RK dropped applesauce in the hallway while being made to move rooms and upon discovering this applesauce Natalie "Doe" did not allow for the visit to continue until plaintiffs cleaned their floor.

e. instructing and advising Plaintiffs how to interact, educate, or disipline their children, although they have no authority or qualifications to do so being that they are younger than plaintiffs, and do not have any children or possess any formal education.

242. Ohel violated Plaintiffs' first ammendment right to free speech and religion. EB told PAK that he shouldn't "lecture" his children about Torah because they are tired after school. EB testified that PAK acted innapropriatley by discussing the miracle of Chanuka with the children in a way that alluded to a comparison between the hellenized Jews of that period to Ohel and EB.

243. Ohel and EB do not allow plaintiffs to be in the building at the same time on days when they have seperate visits, so one of the plaintiffs has to wait in the car. If the chidren arrive early they are taken into a back office so the parents will not be given any extra time with the chldren, not even two minutes. The visits are usually stopped ten minutes early to make the plaintiffs clean the agency's room. Five minutes are lost when plaintiffs have to go to the car to switch shifts.

244. ACS, CS, Ohel, KS, CSH, LP, ND, and EB refuse to take any responsibility in their role in the distress that they cause the Plaintiffs.

245. EB testified that the children are distant from PAK during visits. That is false. The children are always happy to see their parents. The children ask Plaintiffs to come to their foster home or for the Paintiffs to take the children to their home.

246. EB submitted a report that stated the following misleading and false statements , including

but not limited to, and my response:

a. RK complained about pain in her vaginal area-- RK was in foster care at the time and if EB was in fact concerned then why didn't she follow up with a doctor. If EB was not concerned enough to send RK to the doctor yet still included this statement in the report demonstrates EB's negligence and/or malice

b.PAK used drugs in November -- PAK was subitting weekly UAs at the time rendering this allegation an impossiblity

c. children had extreme developmental delays when coming into foster care--RK qualified only for speech therapy and YCK never had any delays. EB reported to Plaintiffs that childrens' school reports the children as being advanced in coparison to their peers.

d. that PAK told RK he loved her and RK responded that that's not true--EB ommitted that PAK tells his daughters that he loves them severa times during visits and gives them kisses and hugs and visits are always very affectionate and joyful.

247. During visits Plaintiffs take turns giving attentionn to each chid individually. Then they switch. Then they clear the table and serve supper followed by family activities.

248. EB and SM claim that RK has "accidents" at foster home after being potty trained and that it is a delayed reaction to visits with PAK. Such claims are defamatory in nature, purely speculative, and lacking any basis to logically come to such an inference rather than to think that children are reacting as a result of being seperated from their parents.

249. EB testified that children were to bring family picture to school. SM advised FM to allow RK to choose which family picture she wants to bring. Three year old RK allegedly did not bring a picture of her father which was a "telling sign".

250. When EB was questioned about the good parts of the visits she exerted great efforts to omit any and all truths that would shed a positive light on the plaintiffs. Plaintiffs have transcribed recordings of EB telling plaintiffs the exact opposite of her testimony on the same exact day that she testified. ie

a."it is a pleasure watching you during visits with the kids"

b." I saw you're both intuitive to what the kids want"

c."when you leave the kids ask about you "where is mommy where is tatti?""

d. "I see that you're both putting in work"

251. PAK told EB "the sooner they come home the sooner we can workout the problem. It's very hard for the children to be taken away from their parents for such a long time". EB responded "it's not a 1,2,3, process of just getting things the way that it would be most ideal. There is a lot of progress that we see on our end". EB admitted that returning the children would be the "most ideal" yet took direct actions to prevent that from happening.

252. EB, KS, and Ohel are therefore directly responsible for the wrongful prolongment of

plaintiffs' deprivation of consortium with their children. By doing so EB, KS, SM, and Ohel acted knowingly and with callous disregard for the best interests of the children.

253. On or around January 13, 2013 DEJ argued that although PAK gave credible testimony to his progress and plaintiffs completed everything that was required of them she supports that the application for 1028 releif be denied on the grounds that it may be harmful for the children to be returned immediatley and that it should be done gradually.

254. SD and JB summarily supported this point of view although it is contrary to the plaintiffs wishes and legislative intent. JAB denied PAK's 1028 request but ordered that the agency increase visitation and "commence with unsupervised and overnight visits on graduated basis."

255. EB, CS, KS, and Ohel maintain that the judge left full discretion to the agency and refuse to commence with unsupervised and overnight visits.

256. The court's decision in this case essentially does away with the 1028 law for anybody whose children are in foster care for an undefined period deemed "too long". The court would then have to uphold every removal in a 1028 held after a certain period of time rendering it moot as was witnessed in this case. In this case the removal had been less than a year and well within the 15 month deadline under Federal guidlines.

257. The BFC's decision sets a dangerous precedent in the spirit of 1028 law, moving away from the current public policy stressing the urgency to reunite children with their birth parents as quickly as possible. Leaving the timeline for the return of the children at the discretion of the agency that stands to profit financially from prolonging foster care is a power that the court should not be allowed delegate.

258. JAB admitted that he was reuctant to deny the 1028 appication and did so with prejudice.

259. To argue that children may potentionally experience emotional harm if returned home to their parents immediatley is a completely unsubstantiated claim and not in accordance with 1028 statute. The law has already determined that prolonged removal is more harmful to the child. The 1028 is designed specifically to grant immediate relief to the parents in the absence of imminent and impending danger to health or life.

260. The legal assumption must remain that parents have the best interest of children in mind and reunification is expected to be a happy experience for the children when they come home. I would argue that anybody with children of their own shares this belief and the law shouldn't be defined by the exception to this rule. Nor does it make sense to believe that the Counsel for the Children can have their best interests in mind when they usually have never even met.

261. If the children were to be returned immediatley, father and mother are prepared to work together with foster family to keep them involved in children's life and make the transition home as smooth as possible.The father and mother have come to know and admire the foster family that stepped up from their Orthodox Jewish community of Crown Heights.

262. Weekly family therapy will also help to resolve any issues that may arise in the children's return home; a most joyous occassion. At home the children have their own room with their own

beds, toys and clothes and within a short time would be able to resume their place in their own home.

263. The Plaintiffs' love and concern for their children, the childrens's own young age and resilience, and the care, love and involvement of the foster family, combined with guidance of a therapist forces plaintiffs to believe that there are enough services and support already in place to mitigate the need for the removal of the children to continue. Not to mention the abundant support from the community, school, Rabbis, synogogue, and mother's family who live around the corner.

267. If the court's decision were to be reversed it would still allow for the agency to be involved and supervise the progress of the children's return home while honoring the families rights.

268. In this case NYCCS and Ohel have failed to provide any evidence or proof that any violence has ever been witnessed by the children or that the children were ever harmed in any way. They also failed to present evidence that the children's return home would be dangerous to their life or health. This is strenghtened by the father's credible testimony and completion and continued participation in a long list of services and his improved relationship with his wife.

269. Both Plaintiffs have been living together without reported incidents since May of 2013, and continue having consistently positive visits with children since the beginning of the case.

270. No finding has been made as to the veracity of the allegations in the petition against the Plaintiffs because no fact finding hearing has yet been held. Section 1028 of the FCA provides that when a child has been removed a parent may request a hearing at any time during the pendency of the proceedings.

271. Except for good cause shown, such hearing shall be held within three court days of the application and shall not be adjourned. The 1028 hearing is intended to give a parent an opportunity for a PROMPT reunion with the child, pending trial. The court shall grant the application "unless it finds that the return presents and imminent risk to the child's lke or health.

272. The Court of Appeals has already recognized that removal causes harm to children and therefore it is incumbent on the Family Court to minimize the time during which the child unnecessarily suffers the harm of removal.

273. Ohel, KS, CSH, and EB will not allow one Plaintiff to take a child to the bathroom while leaving one child with the other Plaintiff unsupervised.

274. On or around January 29, 2013 at the Family Team Conference Ohel, SHM, SM, and CSH

a. refused to give an approximation of when they think the children will be returned.

b. refused to specify any danger to the children

c.refused to explain why the children are not allowed to visit their own home with their parents during community visits

d. insisted that it is the obligation of the Plaintiffs to bring a full home cooked meal for every

visit and nearly crucifying the plaintiffs for the one time that they brought only granola bars and raisins to their two hour visit.

e. attempted to stifle PAK were it not for the advocate from BFDP.

f. refused to focus of speedy reunification by claiming that the children are flourishing in foster care

g. objected to being recorded stating that Ohel's notes will have all the information.

275. On or around January 30, 2013 Plaintiffs had a community visit in Crown Heights supervised by Ohel employee Blemie "Doe" (may be included as Defendants Does 1-1XX). The visit was scheduled to end at 5:00pm. At 4:55pm plaintiffs and children and Blemie were outside community synagogue "770" Eastern Parkway less than a half a block away from the Ohel car that was to transport children to their foster home. Children wanted their parents to take them into the synagogue which would have taken no more than a few minutes and was on the way to the car. Blemie "Doe" did not allow it and RK began to cry all the way to the car.

276. Plaintiffs told Blemie "Doe" that she was not right to make RK cry and it woud have only taken a minute. Blemie "Doe" responded that the visit ends at 5:00pm sharp and there is no time. Blemie "Doe" stated that it is "okay" if RK cries because children cry all the time.

277. All the above goes to show the patterns and modes of operation of Ohel employees who are contracted to ACS and acted under color of law during all times relevant to this case. During every court appearance Ohel worker KS, LP, EB, ND, and CSH were seen sitting and conspiring with CS and laughing while leaving the plaintiffs feeling estranged and clearly made out to be the enemy.

## Introductory Allegations

278. The parent-child relationship is a liberty interest protected by the Due Process Clause of the 14th Amendment.

279. A parent's right to care and companionship of his or her children are so fundamental, as to be guaranteed protection under the First, Ninth, and Fourteenth Amendments of the United States Constitution.

280. The Fourth Amendment protection against unreasonable searches and seizures extends beyond criminal investigations and includes conduct by social workers in the context of a child neglect/abuse investigation.    A police officer and a social worker may not conduct a warrantless search or seizure in a suspected child abuse case absent exigent circumstances. Defendants must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonable necessary to alleviate the threat. Searches and seizures in investigation of a child neglect or child abuse case at a home are governed by the same principles as other searches and seizures at a home.

281. Absent extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures.    An ex parte

hearing based on misrepresentation and omission does not constitute notice and an opportunity to be heard.  Procurement of an order to seize a child through distortion, misrepresentation and/or omission is a violation of the Fourth Amendment.   Parents may assert their children's Fourth Amendment claim on behalf of their children as well as asserting their own Fourteenth Amendment claim.

282. At all relevant times herein, Defendants purported their unfettered prerogative – conferred on them by the Court – to remove [the children] from their school, home and family and that it was entirely within the Department's discretion to proceed at will.

283. Defendants and each of them violated the federal constitutional rights of the Plaintiff by:

a. Summarily seizing the children from their home, parent, and family care without a warrant, just or probable cause, and absent exigent circumstances, in violation of several sections of the New York State Family Court Act and the Fourteenth Amendment of the United States Constitution,
b. Crafting a counterfeit allegation presented to the Court on the initial verified petition   in a successful and concerted effort to obtain a tainted judicial order separating mother from daughters,
c. Withholding exculpatory evidence that may well have changed not only the 1027 Hearing findings, orders, and outcomes, but those of every subsequent hearing (pursuant to FCA §1028), and would confirm the suitability of leaving [the children] in their home and immediately reuniting mother and daughters,
d. Refusing any investigation whatsoever into Plaintiffs claims or proof of innocence, even when presented the opportunity to do so at very nominal cost to the City, and
e. Conducting a defective and one-sided investigation into the facts concerning the suitability of [the children]'s home or immediately reuniting mother and daughter, and ignoring clear and obvious indications that this was appropriate and necessary for the family's health and well being.

284. These official policies, customs, practices, and/or directives of Defendants ACS,NYPD, NYC, and Ohel are causally and affirmatively linked to the deprivation of Plaintiff's constitutional rights and were used, relied upon, and carried out by defendant social workers who in turn targeted Plaintiff through their iniquitous and malevolent conduct without fear of sanction or reprisal.

285. These policies, customs, practices, and/or directives of Defendants ACS, NYPD, NYC, and Ohel are causally and affirmatively linked to the deprivation of Plaintiff's constitutional rights and yet remain standard and routinely relied upon by Defendants even where they are not formally or publically enacted.

286. This conduct was a major cause of the lengthy separation of mother and daughters, causing physical, emotional and economic injuries to Plaintiff, in amounts to be proven at trial, in violation of the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. §1983.

287. Defendants used their positions of authority to damage the interests of Plaintiffs. Defendants' actions in removing and detaining [the children] were outrageous by any standard of decency, yet they acted even in the knowledge that their conduct would likely result in serious damage to Plaintiff, and with reckless disregard for Plaintiff's well-being. The foreseeable susceptibility of small children and their mother forcibly separated without reason did nothing to deter Defendants, who did not relent in their sustained campaign of attacks on Plaintiff, even when they knew it to be unwarranted.

289. Plaintiffs were harmed by the conduct of Defendants, as enumerated above, and that conduct was a major factor in causing physical, emotional and economic injuries to Plaintiff, in amounts to be proved at trial and justifying punitive damages as to individual defendants

290. Plaintiffs suffered shock, fear, indignity, terror and apprehension due directly to actions taken by Defendants. Plaintiff was left elementally vulnerable and further frightened, humiliated, and terrorized by their ongoing conduct.

291. Defendants ACS, NYPD, NYC, and Ohel breached a duty of due care owed to Plaintiff by failing to adhere to acceptable hiring standards, or provide adequate guidance, oversight, supervision and training to their social workers.

292. Defendants ACS, NYPD, NYC, and Ohel breached that duty of due care owed to Plaintiff by failing to implement or enforce any policy that would preclude and prevent the unlawful removal of children from their homes by workers in their employ.

293. The actions of the Defendants described above were intentional and carried out with deliberate indifference to and callous disregard of Plaintiff's rights, well being, and best interests.

294. Plaintiffs suffered irreversible and irreparable harm due in substance to the loss of consortium with [the children] caused by the violation and deprivation of their right to parent their children.

295. The acts and/or omissions of each Defendant promoted the protracted separation of mother and father from children and constituted a major factor in causing Plaintiffs' physical, emotional and economic injuries.

296. The emotionally charged environment rendered Plaintiffs especially susceptible to damages caused by Defendants' targeted attacks. By ambushing Plaintiffs, brandishing their positions, and exploiting their induced vulnerabilities of Plaintiffs, Defendants maximized that damage, and by willful, wanton conduct; justifying punitive damages against individual defendants, in amounts to be proved at trial.

297. Plaintiffs contend that in summarily seizing the children, Defendants obligated themselves and ACS to the duty to [the children]'s due care while the children remained in their custody and

control. By initiating the dependency and commandeering [the children]'s custody, they implicitly assumed a total responsibility for them in most all areas of their well-being.

298. In light of the sheer volume of removal actions initiated by ACS, Defendants and each of them were aware, or should have been aware, of the foreseeable perils their willful misconduct subjected Plaintiffs to and the likely injuries as they accumulated. However, Defendants did nothing to mitigate either the risks or the resulting damage to Plaintiffs.

299. Every action by Defendants and each of them has compounded and accumulated, developing an overall punitive philosophy and approach in their dealings with Plaintiffs.

300. To the extent that the actions of Defendants and each of them described above were not deliberate or intentional, they were done with gross negligence and deliberate indifference to and callous disregard for Plaintiffs' rights and well being.
Plaintiffs suffered irreversible and irreparable harm due in substance to the loss of consortium with their children caused by the violation and deprivation of their right to parent her child.

301. Removal proceedings are to be initiated only if required to secure the safety and well-being of the child and are strictly for "the protection of the child, not the punishment of the parent".

302. Defendants misused the court process with the following willful non-communicative acts:

a. Filing a Dependency Petition in BFC, in the name of [the children], that Defendants knew was false, misleading, and unnecessary;

b. Withholding exculpatory evidence from the Court as enumerated above,

303. The Defendants and each of them intended to induce a tainted court order further detaining [the children] in foster care. They misused the Court's authority and process to accomplish that objective when they summarily seized the children.

304. Further, Defendants and each of them promoted and fostered the very circumstances the FCA charges them with helping to ameliorate. The letter and spirit of the FCA mandates that Defendants and each of them actively assist Plaintiff in overcoming obstacles to family maintenance and reunification – "wherever possible".

305. In diametric opposition to the Legislature's intent and the FCA's mandate, Defendants and each of them promoted, amplified, and influenced circumstances that could then be portrayed to the BFC as "non-compliance" and unacceptably "minimal progress" toward Case Plan fulfillment. This would in turn bolster their recommendation to the Court that Plaintiff's children remian in foster care.

306. Given the vast purview of case workers, their supervisors, and ACS, civil rights violations would be general knowledge throughout the system.

307. All along there were viable options and far less inherently traumatic alternatives to removal and foster care available to ACS. Those options, however, were not then made available to Plaintiff – nor did Defendants and each of them even disclose their existence.

308. Defendants and each of them did not attempt to preserve and strengthen Plaintiffs' family ties or encourage Plaintiffs and their children as a family unit at any time during [the children's] removal   process. From the instant they summarily seized [the children],   Defendants and each of them used the removal process for purposes other than those intended and to propagate the unjust separation of parents and daughters.

309.   At all times mentioned herein, Defendants and each of them acted willfully with the wrongful intention of injuring Plaintiffs and for an improper and immoral motive amounting to malice in that the criminal conduct was intentionally committed by Defendants and was knowingly oppressive, malicious and wanton with the intended purpose of causing harm to Plaintiffs herein.

310. As a direct result of Defendants' punitive, disparaging, unlawful, and unrelenting campaign against them, Plaintiffs were needlessly and maliciously separated from their daughters for approximately 14 months.

311. Each of these actions – taken individually – was unlawful, unconstitutional, and unnecessarily punitive on their own. However, their actions – taken as a series of steps in an overall plan -demonstrated a considered punitive strategy toward Plaintiff and her child that proved more damaging in anthology than the sum of Defendants' cumulative acts. Defendants and each of them executed this conduct in diametric opposition to their own mission statement, the Legislative intent of the FCA, and the well established constitutional rights and liberty interests of Plaintiffs.


312. Plaintiffs maintain that the damages and injuries caused directly by Defendants to Plaintiffs and [the children] have yet to fully accrue.

313. Legal Analysis predating Defendants' and each of them, alleged violations in the Matter of Blossom G. with Honorable Emily Olishansky presiding out of Kings County Family Court on October 15, 2010:

"Whether analyzing a removal application under Family Court Act § 1027 or an application for the return of the children under Family Court Act § 1028, the court must determine whether removal is necessary to avoid imminent risk to the children's lives or health. In considering this question, the court must determine whether there is a risk of "serious harm or potential harm to the child[ren]"; there must be evidence that the harm or danger is "imminent," that is, "near or impending.

In addition, the court must consider whether the risk can be mitigated by reasonable efforts to avoid removal, such as providing services to the family (id. at 378-379; Matter of Naomi R., 296 AD2d 503 [2d Dept 2002]

The plain language of the statute and the legislative history supporting it establish that

"a blanket presumption favoring removal was never intended . . . Rather, a court must weigh, in the factual setting before it, whether the imminent risk to the child can be mitigated by reasonable efforts to avoid removal. It must balance that risk against the harm removal might bring, and it must determine factually which course is in the child[ren]'s best interests" (Nicholson, 3 NY3d at 378; Matter of David Edward D., 35 AD3d 856, 857 [2d Dept 2006]

The Legislature's goal in enacting these provisions was to place "increased emphasis on preventive services designed to maintain family relationships rather than responding to children and families in trouble only by removing the child[ren] from the family" (Nicholson, 3 NY3d at 374). As the Court of Appeals has emphasized, the public policy in this State is to keep families together whenever possible, while continuing to protect the health and safety of the children. This will spare children the trauma of removal and placement in foster care" (id. at 379, quoting Mem of Children and Families Standing Comm, Bill Jacket, L 1989, ch 727, at 7). This goal is based on the well-recognized fact that when children are removed from their caretaker and home they experience emotional and psychological harm. Therefore, it is critically important that the harm children experience from removal not be unnecessarily prolonged and that they are returned to their parents as soon as possible if there is no imminent risk (Matter of Marino S., 100 NY2d 361, 369-371 [2003]).

In Nicholson v Scoppetta, the Court of Appeals also addressed the standard for conducting an emergency removal without parental consent or a court order pursuant to Family Court Act § 1024. That section permits such a removal only

"if there is reasonable cause to believe that the child is in such urgent circumstance or condition that continuing in the home or care of the parent presents an imminent danger to the child's life or health, and there is not enough time to apply for an order . . . Thus, emergency removal is appropriate where the danger is so immediate, so urgent that the child's life or safety will be at risk before an ex parte order can be obtained. The standard obviously is a stringent one"

In considering whether an emergency removal is warranted, the Court emphasized that there must be "persuasive evidence of serious ongoing abuse" and, "based upon the best investigation reasonably possible under the circumstances . . . reason to fear imminent recurrence. Since this evidence is the basis for the removal of a child, it should be as reliable and thoroughly examined as possible to avoid unnecessary harm to the family unit" (id. at 381 [citations omitted]).

In Nicholson, the Court also considered whether the possibility of emotional harm to a child from witnessing acts of domestic violence is sufficient to satisfy the stringent requirements of Family Court Act § 1024. The Court cautioned that emergency removals are only warranted in "very grave circumstances of danger to life and health" (id. at 381). The Court emphasized that "[n]ot every child exposed to domestic violence is at risk of impairment. A fortiori, exposure of a child to violence is not presumptively ground for removal, and in many instances removal may do more harm to the child than good" (Nicholson, 3 NY3d at 375). Consequently, while the Court could not speculate "for all future time, that the possibility can never exist" it emphasized that an emergency removal based on the possibility of future emotional harm would only be warranted in "rare circumstances in which the time would be . . . fleeting and the danger . . . great" (id. at 381-382).

The Second Circuit applied a similar standard in Tenenbaum v Williams (193 F3d 581, 593-594 [2d Cir 1999]). In that case, the court considered whether a removal of a child without parental consent or judicial authorization violated the rights of parents and children. The court concluded that in emergency circumstances

"a child may be taken into custody by a responsible State official without court authorization or parental consent. Emergency circumstances mean circumstances in which the child is immediately threatened with harm . . . [T]he mere possibility of danger is not enough. If it were, officers would always be justified in seizing a child without a court order whenever there was suspicion that the child might have been abused" (id. at 594 [citations and internal quotation marks omitted]).

In the case at bar, having viewed the evidence, continued removal is unnecessary to avoid imminent risk to the children's lives or health. Any risk presented by the father's actions can be mitigated by providing services to the family to ensure their safety. Further, NYCCS has violated a number of the basic principles .

Assumptions, guesswork and unsupported predictions of future behavior cannot substitute for proof and are insufficient to establish a risk of "serious harm or potential harm to the child." As the Court of Appeals and the Second Circuit have held a "mere possibility" of harm is insufficient. If it were, courts would be required to uphold virtually every removal.

The original allegations that the mother may have briefly failed to comply with certain aspects of an order of protection did not justify an emergency removal.. The courts in this State have repeatedly held that a violation of a court order in an article 10 case is insufficient to establish imminent risk or neglect absent a showing that the violation caused impairment or imminent risk of impairment and that the risk outweighed the harm posed by removal .Family Court erred by ordering the removal of the children from the mother's care even though she violated an order of protection since the risk posed by the removal outweighed any detriment arising from the mother's failure to comply with the court's order];proof of a violation of an order of protection is not sufficient by itself to establish neglect];][respondent's violation did not cause or threaten any actual harm to the child and did not establish neglect per se];

## FIRST CAUSE OF ACTION
### *(42 U.S.C. § 1983For Violation of Plaintiff's Federal Civil Rights against All Defendants) (18 UCS 242 Deprivation of Rights Under Color of Law)*

314. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action,and xxx-xxx of introductory allegations as if fully setforth herein.

*315. That all defendants deprived plaintiffs of their procedural due process rights.*

*316.That all defendants state action was egregious, outrageous, and shocked the contemporary conscience.*

*317.That all defendants deprived plaintiffs of their substantive due process rights.*

*Second Cause of Action(18 USC 2236 Searches without Warrant)*

315. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action,and xxx-xxx of introductory allegations as if fully set forth herein.

316. LW, Defendants 1-1XX,   entered PCD's home and pushed her with the door of the apartment in the process of doing so. He said he had to come in because he was helping her.

317. The evidence used to gain entry did not satisfy the standard of probable cause.

318. Under this title LW "shall be fined for a first offense not more than $1000; and, for a subsequent offense, shall be fined under this title or imprisoned not more than one year, or both."

319. Police officers and social workers are not immune from coercing or forcing entry into a person's home without a search warrant.

320. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.


### *Second Cause of Action*

*(18 USC 2236)*

321. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action,and xxx-xxx of introductory allegations as if fully setforth herein.

322. CS told Plaintiffs that if they did not answer a few questions, their children would be taken into or remain in ACS custody and placed in foster care. Officers from the 71st precinct, Defendants Does 1-1XX violently forced their entry into Plaintiffs' home. Plaintiffs were coerced into speaking with them and did so under duress.

323. ANY type of communication, which conveys the idea to the parent that they have no realistic alternative but to allow entry negates any claim that the entry was lawfully gained through the channel of consent.   "Consent to warrantless entry must be voluntary and not the result of duress or coercion. Lack of intelligence, not understanding the right not to consent, or trickery invalidate voluntary consent". "Consent" that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.   Coercive or intimidating behavior supports a reasonable belief that compliance is compelled. Coercion can be mental as well as physical.

324. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional

distress and punitive damages against individual defendants, to be proved at trial.

### Third cause of action

*(18 USC 2236)*

325. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully set forth herein.

326. 71st precinct   and Defendants Does 1-1XX entered   Plaintiff's home forcefibly to conduct an unwarranted search at the bequest of ACS worker CS.

327. CS, 71st precinct, Defendants Does 1-1XX had already confirmed that the children were not in any danger,   therefore   they were fully aware that no exigent circumstances existed.

328. There are two and only two recognized exceptions to the requirement of having a warrant for the conduct of a child abuse investigation:

a.) The adult in charge of the premises gives the social worker his/her free and voluntary consent to enter the home.

b.) The social worker possesses evidence that meets two standards:
(1) it satisfies the legal standard of establishing probable cause; and
(2) the evidence demonstrates that there are exigent circumstances relative to the health of the children.

329. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

Fourth cause of action

*(18 USC 1001)*

330. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action,and xxx-xxx of introductory allegations as if fully setforth herein.

331. ACS, RR, CS, Ohel, KS, LP, EB, SM, Defendants Does 1-1XX have consistently and systematically misled the court by obscuring   the facts of the case and withholding exculpatory evidence thereby obtaining and unjustifiably prolonging the removal of the children from their parents.

332. Court orders obtained based on knowingly false information violates Fourth Amendment.

333. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional

distress and punitive damages against individual defendants, to be proved at trial.

### *FIFTH CAUSE OF ACTION*

334. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action,and xxx-xxx of introductory allegations as if fully setforth herein.

335. CS , 79th precinct ,and Defendants Does 1-XX removed the children from PCD's care without a court order   based on a an allegedly misconstrued e-mail from SD alleging PCD's consent. PCD did not give consent and any comments she may have made to SD were expected by PCD to be protected by attorney-client privilege and remain confidential.

336. Child removals are "seizures" under the Fourth Amendment.   Seizure is unconstitutional without a court order or exigent circumstances.   Social workers and police cannot lawfully seize a child without a warrant or the existence of probable cause to believe the child was in imminent danger of harm. Where police were not informed of any abuse of the child prior to arriving at caretaker's home and found no evidence of abuse while there, seizure of the child was not objectively reasonable and violated the clearly established Fourth Amendment rights of the child. For purposes of the Fourth Amendment, a "seizure" of a person is a situation in which a reasonable person would feel that he is not free to leave, and also either actually yields to a show of authority from police or social workers or is physically touched by police. Persons may not be "seized" without a court order or being placed under arrest.

337. The mere possibility or risk of harm does not constitute an emergency or exigent circumstance that would justify a forced warrantless entry and a warrantless seizure of a child.

338. NYCCS failed to satisfy the statutory requirements for removing the children without parental consent or a court order. Family Court Act § 1024 permits an emergency removal only where there is reasonable cause to believe that a child is in such urgent circumstances that continuing in the care of the parent presents an imminent danger and there is not enough time to apply for an order.

339. The danger must be so immediate, so urgent, that the child's life or safety will be at risk before an ex parte order can be obtained   There must be "persuasive evidence of serious ongoing abuse" and "reason to fear imminent recurrence" (id. at 381). This stringent standard, rarely met in cases involving emotional injury, is met even less frequently in cases involving the risk of emotional injury from witnessing domestic violence (id. at 381-382).

340. In this case, NYCCS did not even allege—let alone introduce—persuasive evidence of serious ongoing abuse and a reason to fear imminent recurrence. Nor, did the petitioner introduce evidence that the child was in danger that was so immediate and so urgent that his life or safety would have been at imminent risk before an order could be obtained. In fact, the evidence is clearly to the contrary. There was more than sufficient time, entirely consistent with the child's safety, to seek a court order.

341. Since the risk to the child was not imminent and there was more than ample time and opportunity to seek a court order, there was no justification for the use of emergency, extra judicial procedures. The decision to nevertheless conduct such a removal, in the aftermath of Nicholson, from a nonabusive parent, raises disturbing questions.

342. This is particularly true here since a Family Court Act § 1028 hearing had already been conducted and a judicial determination already made that any risk to the child could be mitigated or ameliorated by reasonable efforts and a temporary order of protection. Nothing happened during the days following that determination to support this court reaching a different result—let alone NYCCS doing so without court authorization.

343. By proceeding in this manner under these circumstances, NYCCS failed to comply with the standards set forth by the Court of Appeals and the Second Circuit. "

345. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

## SIXTH   Cause of Action

### *(42 USC 1985)(18 USC 241 Conspiracy Against Rights)*

346. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully set forth herein.

347. Upon information and belief Plaintiffs hereby allege that LW and CS conspired against the them because of Plaintiffs' religious beliefs and as an act of retaliation in response to PCD's complaint against LW; this is alleged to have come from racial or class based invidious discriminatory animous of the conspirators actions.

348. Upon information and belief Plaintiffs hereby allege that although Ohel, KS, LP, and EB may not have known about the original circumstances of how the children arrived in foster care they nevertheless participated in the conspiracy to the extent that they promoted CS's agenda while knowing it to be untruthful and contrary to the welfare and well being of the children and the Plaintiffs thereby prolonging the sustained deprivation and damages.

349. This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state. If such acts include kidnapping or an attempt to kidnap, they shall be fined under this title or imprisoned for any term of years, or for life, or may be sentenced to death.

350. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

## SEVENTH Cause of Action

### *(42 USC 14141 Pattern and Practice)*

351. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully set forth herein.

351. It is unlawful for any government authority to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with the responsibility for the administration of juvenile justice that deprives persons of rights protected by the Constitution or laws of the United States.

353. Collectively, the facts corroborate Plaintiff's claim of intentional, planned, and routine objectives to debase Plaintiffs, maintain Plaintiffs' separation from their children, and prolong the removal. Further, considered in total, reconciling Defendants' handling of this family with Plaintiffs' health, welfare or best interests – and that of the child -cannot be done within reason or non-fiction.

354. Defendants' complex deceptions and heavy-handed, malevolent manipulations made ACS worker CS the only contributor of evidence and argument at the 1027 Hearing. Thus, Defendants and each of them were completely unopposed by the unprepared, uninformed, and vulnerable parents of their own deliberate design.

## *SEVENTH CAUSE OF ACTION*

355. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully setforth herein.

356. LW of the 71st precinct NYPD was in fact acting under the authority or color of state law in his official capacity as a police officer.

357. His execution of the NYPD's "customs" and/or "policies" were the moving force behind his unconstitutional acts, and that, personally his unconstitutional acts violated my clearly established constitutional rights of which a reasonable official would have known.

358. The pattern was witnessed on a small scale by PCD when LW, 71st precinct NYPD, Defendants 1-1XX forced their way into her home on three occasion within one week.

359. LW, 71st precinct, NYPD failed to respond to a hate crime in progress against Jewish people and advised perpetrator to apologize.

360. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

### *EIGHTH CAUSE OF ACTION*

361. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully setforth herein.

362. ACS worker CS was in fact, acting under the authority or color of state law at the time this occurred in her official capacity as a social worker for NYCCS.

363. Her execution of New York City's Department of Human Services' "customs" and/or "policies" were the moving force behind her unconstitutional acts, and that personally, her individual unconstitutional acts violated my clearly established constitutional rights of which a reasonable official would have known.

364. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

### *NINTH CAUSE OF ACTION*

365. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully setforth herein.

366. Ohel workers KS, SM, LP, EB, Defendants Does 1-1XX were in fact acting under the authority or color fo state law at all relevant times in their official capacity as actors on behalf of ACS.

367. Ohel deprived Plaintiffs of visitation prior to receiving court approval because CS told them to therein enforcing the practices of ACS

368. Ohel submitted false documents to the court thereby buttressing the agenda and practices of the ACS.

369. Plaintiffs hereby allege that as a direct result of these actions of KS, CS, LP, EB and Defendants Does-1-1XX   to prevent the children from seeing their parents is abuse and neglect thereby causing the children detrimental psychological damage by not allowing consortium of children with mother and father during court order visits.

370. Defendants' and each of them placed the children in imminent and immediate danger of losing their family resulting in irrepairable   life long damages.

371. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

## TENTH Cause of Action

### *(42 USC 671(a)(15); 672 (a)(1) Reasonable Efforts)*

372. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully set forth herein.

373. CS, Defendants Does 1-1XX began their investigation into an alleged complaint made by an anonymous caller on the evening of February 5, 2013. It is impossible to say that CS had the time to conduct a meaningful investigation and make reasonable efforts to ameliorate any danger based on the facts and short period that it took her to decide that removal was necessary.

374. CS did not make her intentions known to the Plaintiffs and acted in a scheming way to trick Plaintiffs and Court to obtain a tainted court order which affected every subsequent decision.

375. No reasonable efforts were made to prevent removal. The Application for Order of Temporary Removal dated February 6, 2013, and the BFC Removal Order dated February 7, 2013, states that the following reasonable efforts were made:

Child Protective Assessment. The CPA contains false allegations and lies.   It is entirely based on fabricated evidence, false allegations, and hearsay.

Safety Plan.   I was unaware of what a "safety plan" was at this time. It was never explained to me.

376. Judicial determinations that remaining in the home would be contrary to the welfare of the child and that reasonable efforts were made to prevent removal and to finalize the permanency plan in effect, as well as judicial determinations that reasonable efforts are not required, must be explicitly documented, made on a case-by-case basis, and stated in the court order.   A transcript of the court proceeding is the only other documentation that will be accepted to verify that these determinations have been made. Affidavits, nunc pro tunc orders, and references to state law are not acceptable.   45 C.F.R. §1356.21(d). The court, after hearing the evidence, must be satisfied that reasonable efforts . . . have been made.   Review and approval of the [state] agency's report and recommendation alone are not sufficient to meet the requirements of the Act; the court must make a determination that the agency's efforts were, in the judgment of the court, reasonable for preventing placement. With regard to emergency situations, if the agency's judgment was that services could not have prevented removal of the child, the court at the time of the adjudicatory hearing must find that the lack of preventive efforts was reasonable.

377. State Judges, as well as Federal, have the responsibility to respect and protect persons from violations of federal constitutional rights.

378. The reasonable efforts claimed to have been made by ACS were inconsistent in the various court documents, which were not questioned before making a determination.

379. ACS was never required to provide specific and detailed documentation to prove that R.E. were in fact made.   42 C.F.R. Section 1356.21(d) requires documentation of judicial determinations concerning both reasonable efforts and contrary to the welfare findings. They are

to be explicitly documented on a case by case basis and so stated in the court order. Facts substantiating the legal conclusion must be stated in the order. Lack of compliance results in denial of federal funds for the child's foster placement.

380. Plaintiffs' children has been wrongfully and unlawfully removed from their physical custody without Constitutional DUE PROCESS, or even the pretext of Reasonable Efforts .

381. Federal law for Reasonable Efforts state that they provide services to prevent removal or make reunification possible when requested. IN THE EVENT OF 'EMERGENCY REMOVAL' of a child from his home - a "safeguard' to parents and children that due process will be guaranteed by informed, unbiased judiciaries, who are to mandate accountability for 'reasonable efforts', that 'Child Protection' agencies be mandated to prove compliance with 'reasonable efforts' and not merely accept a preprinted form submitted by Child Protection agencies, for a 'rubber-stamped approval' by the court , thereby denying the parent and child due process rights to present evidence to the contrary.

382. It is no longer sufficient to merely recite those conclusions, rather facts to support the conclusions must accompany the application. At a minimum, the court order should incorporate the facts stated in the application for removal which justify the findings. 45 C.F.R. Section 1356.21(c), 42 U.S.C. Section 472(a)(1).

45 C.F.R. Section 1356.21(c) which implements 42 U.S.C. 472(a)(1) provides that "the contrary to welfare finding must be made in the first court ruling that sanctions (even temporarily) the removal of the child from the home." The comment at page 4055 of the federal register indicates the first order includes ex parte orders. Mere use of boilerplate language is not acceptable. 42 C.F.R. Section 1356.21(d) requires documentation of judicial determinations concerning both reasonable efforts and contrary to the welfare findings. They are to be explicitly documented on a case by case basis and so stated in the court order. Facts substantiating the legal conclusion must be stated in the order. Lack of compliance results in denial of federal funds for the child's foster placement.

383. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

.

### *ELEVENTH CAUSE OF ACTION*

390. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully setforth herein.

## TWELFTH Cause of Action

### *(18 USC 1001 Fraudulent Statements)*

392. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action,and xxx-xxx of introductory allegations as if fully setforth herein.

393. CS, KS, LP, SM, EB , Defendants Does 1-1XX falsified, concealed, and covered up by trick, scheme, and devices material facts.

394. Defendants made materially false, fictitious, and fraudulent statements and representations. Defendants made use of false writing and documents knowing them to contain materially false, fictitious, or fraudulent statements or entries and may be fined under this title..

395. A lie of omission is to remain silent when ethical behavior calls for one to speak up. A lie of omission is a method of deception and duplicity that uses the technique of simply remaining silent when speaking the truth would significantly alter the other person's (the judge's) capacity to make an informed decision.

396. ACS, CS, RR, Defendants Does 1-1XX

a. summarily seized the children unlawfully by limiting the time Plaintiffs had to discover their options before the initial hearing,
b. verified the above referenced falsehoods on the initial petition and submitting them as fact in their pre-removal report to the Court,
c. withheld exculpatory evidence and information vital and entitled to Plaintiffs and the BFC

397. Defendants and each of them enjoyed and relied on a presumptive integrity conferred by the very court on which they perpetrated this fraud. Predictably, Defendants CS and Does 1-1XX succeeded in securing a court order for the child's continued removal on March 7, 2013. Plaintiffs claims the court order was the intended result of ACS' well-orchestrated, deftly choreographed, and oft-rehearsed tactical steps.

398. Defendants ACS, Ohel, LP, EB and Does 1-1XX stalled   provider referrals and services to insinuate Plaintiffs' inaction and limited progress toward family reunification. Defendants LP and EB took full advantage of this engineered advantage in their subsequent review reports to the Court. This also delayed and arrested any development of professional, respected advocates for Plaintiffs, keeping the only opinions and evidence offered in and to the Court that of ACS and Ohel workers.

399. Using these and other tactics and misrepresentations, Defendants ACS , Ohel and Does 1-1XX   persuaded the Court, at several junctures, to further detain [the children]in foster care, separated from their parents.

400. As a result, Plaintiff was prejudiced in legal and public forums, forced to overcome erroneous credibility issues in the eyes of the Court and the community. This fraud and deceit directly caused irreparable pain and suffering to both Plaintiff and laid the very foundation for Plaintiff's separation under false pretense.

401. The acts and omissions of the Defendants and each of them constituted a major factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

## Thirteenth Cause of Action

402. Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs xx-xxx of Facts common to all causes of action, and xxx-xxx of introductory allegations as if fully set forth herein.

403. Plaintiffs contend that the Petition, Case Plan and FCA constitute an implied contract (conceived, implemented and filed at the will of the Department) between Plaintiff and Defendants. Offered no real alternatives, Plaintiffs were compelled to comply with an illegal contract, given the gravity of consequences had she not done so.

404. Plaintiffs were thereby unwittingly and unwillingly drawn into a contractual relationship with Defendants the moment [the children] were detained by ACS workers.

405. All parties were then bound by this implied contract, each with rights, rewards, and responsibilities laid out in the Case Plan. Plaintiffs' 'reward' for satisfying these same terms and conditions was the promised return of their daughters and Defendants' relenting in the pursuit to terminate her parental rights.

406. Had Plaintiffs not performed all conditions and fulfilled all requirements to the subjective satisfaction of Defendants and each of them, [the children] would not be returned to their parents and their parental rights may well have been terminated by the Court at Defendants' recommendation.

407. Defendants and each of them imposed an illegal contract on Plaintiffs by violating the FCA when and as they summarily seized the child. Because Plaintiffs were forced into this contract as a result of Defendants' fraud and false pretense, Plaintiffs believe that said contract is null and void from its inception and but for the deceit and bad faith shown by Defendants, Plaintiffs would not have been subjected to the extensive burdens of the illegal contract.

408. The UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT in Smith et al. v. Williams-Ash No. 06-4638, Decided and Filed: March 26, 2008 said: "We do not doubt that the Smiths, as any parents likely would, resented the safety plan from the beginning. But mere displeasure and frustration fails to negate their consent. Rather than remind Williams-Ash of what she already knew—that they disliked the plan—the Smiths needed to explicitly withdraw the consent they explicitly gave, thus requiring Children's Services to either return the children or file a formal complaint against them. In light of their admitted failure to do so, the Smiths were not entitled to a hearing."

409. For this reason, Plaintiffs hereby rescind any and all signatures to "voluntary" safety and service plans or any other "agreement". Such signatures were obtained through duress, threat, and coercion. Plaintiffs had no way of knowing the long-range ramifications of doing so and now explicitly withdraw any consent I gave.

410. In the opinion of Judge Stephen Limbaugh Jr. in the majority <u>Opinion of the Supreme Court of Missouri, In the Interest of: P.L.O. and S.K.O., minor children. SC85120 (3/30/2004):</u>  "The mother voluntarily consented to the court's jurisdiction over her children, voluntarily transferred their custody to the division and never challenged the circumstances of their removal. Accordingly, she cannot now challenge whether an 'emergency' existed to justify removal of her child under (the statute in question) and this court need not address such a challenge."

411. Plaintiffs are therefore establishing ON THE RECORD that they strongly challenge that an emergency existed to remove their children, and most certainly do withdraw any "voluntary" agreements they were coerced into entering into.

412. Plaintiffs were coerced into signing a "voluntary" Service Plan.   The ACS worker, CS, and Ohel workers KS, LP, EB and Defendants 1-1XX threatened Plaintiffs that if they did not sign and complete the "voluntary" service plan that their children would be TPR'ed.   <u>According to Amanda C., by and through Gary Richmond, natural parent and next friend, appellee, v. Kelly Case, appellant. N.W.2d   Filed May 23, 2008. No. S-06-1097 this is unauthorized practice of law and acting under the Color of Law.</u>


<u>Fourteenth Cause of Action IN Negligence</u>

413:Plaintiffs re-allege and incorporate by this reference each and every allegation of paragraphs of Facts common to all causes of action, and of introductory allegations as if fully set forth herein at length.


414. That all defendants owed a duty of care to the plaintiffs and the Kutsy children.


415. That all defendants breached that duty.


416. That all defendants were negligent , hazardous and careless.


417. That all defendants behavior was deficient and less than ordinary man would provide under the circumstance.


418. That all defendants violated their own rules and regulations and guidelines.

# P L A I N T I F F ' S   V E R I F I C A T I O N

The undersigned is the plaintiff in the within action; has read the forgoing VERIFIED AMENDED COMPLAINT and knows the contents thereof; the same is true to plaintiff's own knowledge , except as to those matters said to be upon information and belief and as to those matters, plaintiff believes it to be true.

Dated: New York, New York
       March 17,2015

_____

**Allen Kutsy**
**Plaintiff**

Sworn to Before Me this 17Th day of
March , 2015

JEFFREY LESSOFF
Notary Public, State of New York
No. 02LE4982066
Qualified in Nassau County
Commission Expires May 28 / 5

JEFFREY GLASSER
Notary Public, State of New York
No. 02LE6282055
Qualified in Nassau County
Commission Expires May 28

419. That all defendants were overworked and underpaid and therefore did not have the requisite knowledge, experience and attitude to treat this family properly; to integrate the law and regulations into this fact pattern and to keep this family together.

420. That defendants behavior was a proximate cause of the children negligently being removed from the family and then negligently keeping them removed for over a year and causing great emotional, and physical damages.

Wherefore, The acts and omissions of the Defendants and each of them constituted a substantial factor in causing Plaintiff physical, emotional and economic injuries, in amounts, including emotional distress and punitive damages against individual defendants, to be proved at trial.

Yours, etc.

The Law Firm of Jeffrey Lessoff / /(9460)

125 Maiden Lane Suite 3E

New York, New York 10038

212-219-9257